T.C. Memo. 2016-183

UNITED STATES TAX COURT

ESTATE OF EDWARD G. BEYER, DECEASED, CRAIG E. PLASSMEYER, EXECUTOR, Petitioner <u>v.</u> COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 10231-11.                    Filed September 29, 2016.

<u>John W. Porter</u>, <u>Keri D. Brown</u>, and <u>Jeffrey D. Watters, Jr.</u>, for petitioner.

<u>Naseem J. Khan</u>, <u>David A. Lee</u>, and <u>James Cascino</u>, for respondent.

CONTENTS

FINDINGS OF FACT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    4

General Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    4

Mr. Beyer's Estate Planning. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    6

Section 529 Accounts and Certain Other Gifts. . . . . . . . . . . . . . . . . . . . . . .   89

**[*2]** EGBLP's Partnership Returns. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

Decedent's Income Tax Returns. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

Mr. Beyer's Gift Tax Returns. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

Estate Tax Return. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

Notice of Deficiency. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

OPINION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

Estate Tax. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113
    Section 2036(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113
        Transfer of Property by Mr. Beyer. . . . . . . . . . . . . . . . . . . . . . . 115
        Transfer Other Than a Bona Fide Sale for an Adequate
          and Full Consideration in Money or Money's Worth. . . . . . . . 115
        Possession or Enjoyment of, or Right to Income From,
          the Property Transferred. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127
        Value of Assets Includible in the Value of the Gross Estate of
          Decedent Under Section 2036(a)(1). . . . . . . . . . . . . . . . . . . 138

Gift Tax. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 144
    Section 529 Accounts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 144
    Additions to Tax and Accuracy-Related Penalty. . . . . . . . . . . . . . . . . 148
        Section 6651(a)(1) and (2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149
        Section 6662(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153

MEMORANDUM FINDINGS OF FACT AND OPINION

CHIECHI, <u>Judge</u>: Respondent determined a deficiency of $19,066,532 in

Federal estate tax (estate tax) with respect to the Estate of Edward G. Beyer

[*3] (decedent's estate).  Respondent also determined a deficiency in, and additions under section 6651(a)(1) and (2)[1] to, Edward G. Beyer's Federal gift tax (gift tax) for his taxable year 2002 of $174,300, $43,575, and $39,217, respectively.  Respondent further determined a deficiency in, and an accuracy-related penalty under section 6662(a) on, Edward G. Beyer's gift tax for his taxable year 2005 of $3,933,948 and $786,790, respectively.

The issues remaining for decision are:

1.  Is the value of assets that Edward G. Beyer transferred to a certain limited partnership includible in the value of his gross estate under section 2036(a)?  We hold that it is.

2.  Is decedent's estate entitled to discount the value on the alternate valuation date of assets of a certain limited partnership, which the parties stipulated, that we have held is includible in the value of his gross estate under section 2036(a) in order to determine the value of those assets on that date that is so includible?  We hold that it is not.

---

[1]All section references relating to estate tax are to the Internal Revenue Code (Code) in effect on the date of Edward G. Beyer's death.  All section references relating to gift tax, additions to gift tax, and an accuracy-related penalty on gift tax are to the Code in effect for Edward G. Beyer's taxable years 2002 and 2005.  All Rule references are to the Tax Court Rules of Practice and Procedure.

**[\*4]**   3.  Are the $55,000 that Edward G. Beyer contributed in 2002 to each of ten so-called section 529 accounts and the $55,000 that he contributed in 2005 to each of eight section 529 accounts taxable gifts that he made during his taxable years 2002 and 2005, respectively?  We hold that all of those contributions are.

4.  Is Edward G. Beyer liable for an addition to gift tax under section 6651(a)(1) for his taxable year 2002?  We hold that he is.

5.  Is Edward G. Beyer liable for an addition to gift tax under section 6651(a)(2) for his taxable year 2002?  We hold that he is.

6.  Is Edward G. Beyer liable for the accuracy-related penalty under section 6662(a) for his taxable year 2005 on the portion of the underpayment in gift tax for that year that is attributable to the $55,000 that he contributed to each of eight section 529 accounts in that year?  We hold that he is.

FINDINGS OF FACT

Many of the facts have been stipulated and are so found.

General Background

Edward G. Beyer (Mr. Beyer or decedent) was a resident of Chicago, Illinois, at the time of his death on May 19, 2007.  After Mr. Beyer died, the probate division of the Circuit Court of Cook County, Illinois, appointed decedent's nephew, Craig E. Plassmeyer (Craig Plassmeyer), executor of

**[\*5]** decedent's estate.  Craig E. Plassmeyer resided in Thousand Oaks, California (Thousand Oaks), at all relevant times, including at the time he filed the petition in this case.

Mr. Beyer, who was born in 1910, never married and had no children.  Mr. Beyer had four sisters:  Mildred Beyer, Ruth E. Plassmeyer (Ruth Plassmeyer), Lucille V. Wilkinson (Lucille Wilkinson), and Eleanor Beyer and one brother, Robert Beyer.  Two of Mr. Beyer's sisters, Ruth Plassmeyer and Lucille Wilkinson, were alive at all relevant times.  For a period not established by the record during his lifetime, Mr. Beyer permitted Ruth Plassmeyer and Lucille Wilkinson to live in certain condominium apartments (condos) that he owned and paid certain expenses relating to those condos.

In addition to Craig Plassmeyer, Mr. Beyer had another nephew, Bruce R. Plassmeyer (Bruce Plassmeyer), and he also had a niece, Doris Kaminski.  From 1999 to the date of Mr. Beyer's death on May 19, 2007, Craig Plassmeyer[2] traveled from California to Chicago approximately once a month to visit family,

---

[2]Craig Plassmeyer received at different times from the Urbana-Champaign campus of the University of Illinois a bachelor of science degree in chemistry and mathematics and a master's degree in business administration, with specialties in marketing and finance.  From 1999 until at least the time of the trial in this case, Craig Plassmeyer was the co-owner of a healthcare company in Thousand Oaks that provided high-skilled home nursing care to persons after they had been discharged from hospitals.

**[*6]** including Mr. Beyer. As Mr. Beyer advanced in age, Bruce Plassmeyer,[3] who lived in Chicago, assisted Mr. Beyer in certain day-to-day activities. Mr. Beyer did not have a close relationship with Doris Kaminski.

Mr. Beyer spent most of his life working for Abbott Laboratories (Abbott) in Chicago, Illinois. Mr. Beyer ultimately became that company's chief financial officer. Over the course of his employment with Abbott, Mr. Beyer acquired stock options from that company, began exercising those options around 1962, and accumulated a substantial amount of Abbott stock. The only time that Mr. Beyer sold any of the Abbott stock that he had acquired was to purchase a house in the 1970s.

In June 1999, Mr. Beyer held 800,000 shares of Abbott stock, certain other stock, certain other noncash property, and a certain amount of cash.

Mr. Beyer's Estate Planning

At a time not established by the record, Mr. Beyer was introduced to an attorney named Michael H. Erde (Mr. Erde), who specialized in estate planning. After consulting with Mr. Erde, Mr. Beyer decided to form a trust. On June 8, 1999, Mr. Beyer executed a trust agreement (1999 Trust agreement) that Mr. Erde

---

[3]At all relevant times, Bruce Plassmeyer, who never married, had more limited business experience than Craig Plassmeyer.

[*7] had prepared and thereby formed a trust that was designated in that agreement as the "EDWARD G. BEYER TRUST dated June 8, 1999" (1999 Trust). In the 1999 Trust agreement, Mr. Beyer identified himself as both the settlor and the initial trustee of the 1999 Trust and recited that the initial 1999 Trust property was $10 in cash. On June 8, 1999, the date on which Mr. Beyer formed the 1999 Trust, he transferred certain assets, including 800,000 shares of Abbott stock, to a brokerage account at Banc One Securities Corp. (Banc One)[4] that he had opened in the name of the 1999 Trust (1999 Trust Banc One account).

As pertinent here, the 1999 Trust agreement provided:

ARTICLE II

Commencing as of the date of this instrument and during my life, the trustee shall administer the trust principal and any net income thereof as follows:

A. The trustee shall allow me and any of my sisters the right to occupy rent-free any house, condominium (residential property) or garage and any furniture therein (wherein they are living), which property or any interest therein (including any interest as owner, lessee, shareholder, trust beneficiary or otherwise) from time to time forms a part of the trust principal. At any time or times while we shall have that right, the trustee may, with either of our approvals (mine and the sister living in the residence), that approval being required only if we (myself and the sister living in the particular

---

[4]The record is inconsistent with respect to the spelling of the first word in the name of Banc One Securities Corp. We took judicial notice of the correct spelling of that word.

[*8]   residence) are not "disabled" as determined in paragraph D of this Article):

1.  Sell the interest in residential property forming a part of the trust principal and invest such amounts as the trustee believes desirable in any other interest in residential property selected by the trustee; or

2.  Terminate the right given to me under this paragraph and lease, sell, or otherwise dispose of or administer any such interest in residential property in the same manner as any other trust asset.

B.  After my death, any residential property in this trust shall be managed as follows:

1.  If any of my sisters wishes to live in a residence of mine, said residence shall not be sold without the approval of such sister living in the residence (as long as she is not disabled as defined herein).

2.  At such time as a sister of mine no longer lives in such residence for three months or leaves such residence for three months, then said residence shall be sold.

3.  Any sister living in a residence shall not pay rent nor pay any expenses regarding the residence (including taxes and insurance), but they shall pay their own phone and electric bills.

C.  In addition to the provisions of Paragraph A and B of this Article and during my life, the trustee shall administer the trust principal and any net income thereof as follows:

1.  The trustee shall distribute to me or apply for my benefit such amounts of net income and principal, even to the extent of exhausting principal, as the trustee believes desirable from time to time for my health, support in reasonable comfort, best interests, and welfare, considering all circumstances and factors deemed pertinent

[*9] by the trustee.  Any undistributed net income shall be accumulated and added to principal, as from time to time determined by the trustee.

2.  In addition, the trustee shall distribute to me or others such amounts of net income and principal as I may from time to time direct in writing, except that if the trustee believes that I am unable to manage my business affairs properly because of advanced age, illness, or other cause, the trustee may, in the trustee's sole discretion, decide not to honor my written direction.

\*        \*        \*        \*        \*        \*        \*

## ARTICLE III

Following my death, the trustee shall pay out of the trust principal all (a) my legally enforceable debts, including debts owed by me to a trustee individually, except debts which are an encumbrance on real property, (b) the expenses of my last illness and funeral, (c) the administration expenses payable by reason of my death, and (d) the estate and inheritance taxes (including interest and penalties, if any) payable in any jurisdiction by reason of my death (including those administration expenses and taxes payable with respect to assets which do not pass under this trust).

\*        \*        \*        \*        \*        \*        \*

## ARTICLE IV

As of the date of my death, but after providing for the payments, if any, required by Article III of this instrument, the trustee shall manage or distribute the remaining trust principal (including property to which the trustee may be entitled under my will or from any other source), as follows:

A.  If any of my sisters survives me (and for purposes of this Article if the actual sequence of our deaths cannot readily be determined, I shall have presumed to have survived my sisters), the

trustee shall allocate, as of the date of my death, from the trust principal (including property to which the trustee may be entitled under my will or from any other source) to (2) separate trusts, one named for my sister, MILDRED L. BEYER, with the amount of One Hundred Thousand Dollars ($100,000.00) and one named for my two sisters, RUTH E. PLASSMEYER and LUCILLE V. WILKINSON, with the amount of Two Hundred Twenty Five Thousand Dollars ($225,000.00).

B.  The trust named for MILDRED L. BEYER shall be administered as follows:

1.  Commencing as of the date of my death and during the life of MILDRED L. BEYER and as long as she is living at 5928 North Landers, in Chicago, Illinois, the trustee shall distribute the funds from the MILDRED L. BEYER TRUST to pay all costs and expenses of said Landers property.  When MILDRED L. BEYER then leaves said property pursuant to Article II, the trustee shall distribute to MILDRED L. BEYER or for her benefit as much or all of the income or principal of the trust as the trustee from time to time believes desirable for the health and support in reasonable comfort of MILDRED L. BEYER, considering all circumstances and factors deemed pertinent by the trustee.

2.  Upon the death of MILDRED L. BEYER, the then remaining principal of her trust and any accrued or undistributed net income thereof shall be added to, and shall thereafter be administered under Section D in this Article.

C.  The second trust named for RUTH E. PLASSMEYER and LUCILLE V. WILKINSON shall be administered as follows:

1.  The income and principal of this trust shall be used to pay for the costs and expenses (except for telephone and electric bills) of maintaining the respective condominiums and their garages that these two sisters reside in.

2. At such time as the first to happen that a sister shall move out of her respective condominium (per Article II) or die, then said condominium and its associated garage(s) shall be sold and the proceeds distributed to CRAIG E. PLASSMEYER, if alive, otherwise to his descendants per stirpes.

3. At such time that neither RUTH E. PLASSMEYER nor LUCILLE V. WILKINSON is living in her respective condominium, then the trust set up for RUTH E. PLASSMEYER and LUCILLE V. WILKINSON shall be terminated and the balance therein shall be distributed outright to CRAIG E. PLASSMEYER, if living, otherwise to his descendants per stirpes.

D. As of the date of my death, but after providing for the payments, if any, required by Article II of this instrument, and the allocations, if any, required by A, B, & C [of Article IV] above, the trustee shall distribute the balance of the trust as follows:

(1)     One-third (1/3) to DORIS KAMINSKI, if living, otherwise to her descendants, per stirpes;

(2)     One-third (1/3) to BRUCE PLASSMEYER, if living, otherwise to his descendants, if any, per stirpes, otherwise half of this one-third to DORIS KAMINSKI, if living, otherwise to her descendants per stirpes, and half of this one-third to CRAIG PLASSMEYER, if living, otherwise to his descendants per stirpes; and

(3)     One-third (1/3) to CRAIG PLASSMEYER, if living, otherwise to his descendants per stirpes.

*     *     *     *     *     *     *

## Article VII

A. Any trustee may resign at any time by giving prior written notice to me, if I am then living, or if I am not then living, to the

**[*12]** beneficiary or beneficiaries to whom the current trust income may or must then be distributed.

B. Except as otherwise provided in paragraphs D of this Article:

1. If I cease to act as trustee hereunder for any reason, I name CRAIG PLASSMEYER as trustee; and

2. If CRAIG PLASSMEYER fails or ceases to act as trustee hereunder for any reason, then BRUCE PLASSMEYER shall act as trustee.

C. The person or persons indicated in paragraph E of this Article may at any time, by written instrument, approve the accounts of the trustee with the same effect as if the accounts had been approved by a court having jurisdiction of the subject matter and of all necessary parties.

D. As often as the trustee shall deem such action to be advantageous to the trusts or to any beneficiary, the trustee may, by written instrument, resign and appoint as substitute trustee with respect to all or any part of the trust principal, including property as to which the trustee cannot act, any person, or any bank or trust company, within or outside the State of Illinois. The substitute trustee shall have all of the title, powers, and discretion of the original trustee, but shall exercise the same under the supervision of the resigning trustee, who shall act as adviser to the substitute trustee. The adviser may at any time remove the substitute trustee by written instrument delivered to the substitute trustee. Upon the removal or resignation of the substitute trustee, the adviser may resume the office of trustee or may continue to act as adviser and appoint another substitute trustee. Any adviser may receive reasonable compensation for services as adviser.

E. The accounts of the trustee may be approved pursuant to paragraph C of this Article by me, if then living, or after my death, by

[*13] a majority in number of DORIS KAMINSKI, BRUCE PLASS-MEYER, and CRAIG PLASSMEYER, if alive, otherwise to their descendants per stirpes.  If any person so entitled to act is then under legal disability, the instrument of appointment or approval may be signed by the lawful guardian of such person on his or her behalf.

      F.  The incumbent trustee shall have all of the title, powers, and discretion granted to the original trustee, without court order or act of transfer.  No successor trustee shall be personally liable for any act or failure to act of a predecessor trustee.  With the approval of the person or persons indicated in paragraph E of this Article who may approve the accounts of the trustee, a successor trustee may accept the account furnished, if any, and the property delivered by or for a predecessor trustee without liability for so doing, and such acceptance shall be a full and complete discharge to the predecessor trustee.

    \*      \*      \*      \*      \*      \*      \*

In a letter dated June 30, 1999 (June 30, 1999 letter) from Patrick J. Edwards (Mr. Edwards) of First Chicago Insurance Services, Inc., to Craig Plassmeyer,[5] Mr. Edwards identified certain asset transfer strategies that he recommended Mr. Beyer consider, including what Mr. Edwards described in that letter as:  (1) intentionally defective irrevocable trusts; (2) family limited partnerships; (3) grantor retained trusts; and (4) irrevocable life insurance trusts.  Mr. Edwards indicated in his June 30, 1999 letter that "[i]n the case of the first

---

[5]Mr. Edwards sent a copy of his June 30, 1999 letter to Charles Holup (Mr. Holup), Mr. Beyer's investment advisor who worked for JPMorgan Chase Bank (Chase).  Mr. Beyer had introduced Mr. Holup to Craig Plassmeyer in 1999 because Mr. Beyer wanted Craig Plassmeyer to play a role in Mr. Beyer's financial planning matters.

[*14] three strategies, the primary reason for their use is to discount the value of assets for transfer purposes. * * * [T]his tends to hinge on lack of control and marketability of the assets which have been transferred." He further advised Craig Plassmeyer in that letter that each potential strategy had "pros and cons" and that "[c]oordination with tax counsel could help quickly ferret out the probability [that] one or more of the transfer techniques could assist in minimizing income, gift and estate tax liabilities for all involved."

As Mr. Beyer advanced in age, he desired to give Craig Plassmeyer a power of attorney over his property. On October 29, 2001, Mr. Beyer signed a power of attorney that was to be construed under the laws of the State of Illinois (Illinois law), in which he named Craig Plassmeyer as his attorney-in-fact. That power of attorney stated in pertinent part:

> THE PURPOSE OF THIS POWER OF ATTORNEY IS TO GIVE THE PERSON YOU DESIGNATE (YOUR "AGENT') BROAD POWERS TO HANDLE YOUR PROPERTY, WHICH MAY INCLUDE POWERS TO PLEDGE, SELL OR OTHERWISE DISPOSE OF ANY REAL OR PERSONAL PROPERTY WITHOUT ADVANCE NOTICE TO YOU OR APPROVAL BY YOU. * * * UNLESS YOU EXPRESSLY LIMIT THE DURATION OF THIS POWER IN THE MANNER PROVIDED BELOW, UNTIL YOU REVOKE THIS POWER OR A COURT ACTING ON YOUR BEHALF TERMINATES IT, YOUR AGENT MAY EXERCISE THE POWERS GIVEN HERE THROUGHOUT YOUR LIFETIME, EVEN AFTER YOU BECOME DISABLED. * * *

[*15] On December 17, 2001, Mr. Beyer signed a document titled "FIRST AMENDMENT TO EDWARD G. BEYER DECLARATION OF TRUST" that Mr. Erde, Mr. Beyer's estate planning attorney at that time, had prepared. In that document, Mr. Beyer amended paragraph (C)(1) of Article II of the 1999 Trust agreement (quoted above) by deleting the words "best interests, and welfare" from that paragraph. After that amendment, that paragraph of the 1999 Trust agreement provided:

> 1. The trustee shall distribute to me or apply for my benefit such amounts of net income and principal, even to the extent of exhausting principal, as the trustee believes desirable from time to time for my health, support in reasonable comfort, considering all circumstances and factors deemed pertinent by the trustee. Any undistributed net income shall be accumulated and added to principal, as from time to time determined by the trustee.

On May 2, 2002, Mr. Erde sent to Mr. Beyer and Craig Plassmeyer for review and comment a draft copy of a proposed second amendment to the 1999 Trust agreement. Thereafter, on May 21, 2002, Mr. Beyer signed a document titled "SECOND AMENDMENT TO EDWARD G. BEYER DECLARATION OF TRUST". In that document, Mr. Beyer amended, inter alia, paragraph (D) of Article IV of the 1999 Trust agreement. After that amendment, that paragraph of the 1999 Trust agreement provided:

[*16]       D.  As of the date of my death, but after providing for the payments, if any, required by Article II of this instrument, and the allocations, if any, required by A, B, & C [of Article IV] above, the trustee shall distribute the balance of the trust as follows:

> (1)    One-fifth (1/5) to DORIS KAMINSKI, if living, otherwise to her descendants, per stirpes;
>
> (2)    Two-fifth (2/5) to BRUCE PLASSMEYER, if living, otherwise to his descendants, if any, per stirpes, otherwise half of this two-fifths to DORIS KAMINSKI, if living, and half of this two-fifths to CRAIG PLASSMEYER, if living, otherwise to his descendants per stirpes; and
>
> (3)    Two-fifth (2/5) to CRAIG PLASSMEYER, if living, otherwise to his descendants per stirpes.

Mr. Holup wanted Mr. Beyer and Craig Plassmeyer to be aware of certain estate planning options that Mr. Beyer should consider.  Consequently, in 2003, Mr. Holup introduced them to Michael J. Stuart (Mr. Stuart), an estate planning attorney who was serving as of counsel to Anthony J. Madonia & Associates, Ltd. (Madonia & Associates).[6]  In May 2003, Mr. Beyer retained Madonia & Associates to perform services in developing and implementing an estate plan for Mr. Beyer.  That firm was still serving in that capacity when Mr. Beyer died on May 19, 2007.

---

[6]At all relevant times, including during 2003 and at the time of the trial in this case, Anthony J. Madonia (Mr. Madonia), who owned Madonia & Associates, was a business and estate planning attorney.

[*17] In an engagement letter dated May 23, 2003 (May 23, 2003 engagement letter) from Mr. Madonia to Craig Plassmeyer,[7] Mr. Madonia confirmed that his firm was to prepare a detailed analysis of Mr. Beyer's current estate plan as well as certain alternative estate plans that were to be designed to reduce Mr. Beyer's estate tax without requiring him to relinquish control of his assets. Craig Plassmeyer signed the May 23, 2003 engagement letter.

In an engagement letter dated July 16, 2003 (July 16, 2003 engagement letter)[8] from Mr. Madonia to Mr. Beyer, Mr. Madonia discussed a meeting that took place on July 9, 2003, in which Mr. Madonia presented certain alternative estate planning strategies to Mr. Beyer. In the July 16, 2003 engagement letter, Mr. Madonia confirmed that his firm was to take steps to implement certain estate planning strategies that he had presented to Mr. Beyer at that meeting. Mr. Beyer signed the July 16, 2003 engagement letter.

From around May until October 13, 2003, Mr. Stuart, Mr. Madonia, Craig Plassmeyer, and Mr. Beyer held certain discussions regarding various strategies that would minimize the estate tax to be paid after Mr. Beyer died. As of October

---

[7]In the May 23, 2003 engagement letter, Mr. Madonia referred to a meeting that he had had with Craig Plassmeyer in which Mr. Madonia had discussed estate planning options for Mr. Beyer.

[8]The record does not establish why there are two engagement letters.

[*18] 13, 2003, the strategies that Mr. Beyer had decided to use in order to accomplish that objective included two revocable grantor trusts, a limited partnership, and an irrevocable trust. One of the revocable grantor trusts was to be the general partner of the limited partnership, and the other revocable grantor trust was to be the limited partner of the limited partnership. The irrevocable trust, which Mr. Beyer was not to form until some time after the creation of the limited partnership, was to purchase the limited partnership interest of the revocable grantor trust that was to be the initial limited partner of the limited partnership.

In order to implement the estate planning strategies that Mr. Beyer had chosen, on October 13, 2003, he, inter alia, signed his last will and testament (Mr. Beyer's will) that Madonia & Associates had prepared for him.[9] In Mr. Beyer's will, he named Craig Plassmeyer as the executor of his estate. Mr. Beyer gave the following directive in Mr. Beyer's will:

> I direct that the taxes imposed by reason of my death upon property passing under and outside my will be apportioned and paid in the manner provided in the EDWARD G. BEYER LIVING TRUST, and I incorporate the tax apportionment provisions of that [sic] the EDWARD G. BEYER LIVING TRUST as part of my will.

In order to implement the estate planning strategies that Mr. Beyer had chosen, on October 13, 2003, Mr. Beyer also signed three separate powers of

---

[9]Mr. Beyer never amended Mr. Beyer's will.

**[*19]** attorney (October 13, 2003 powers of attorney), each of which was to be construed under Illinois law and each of which Madonia & Associates had prepared for him. In each of the three October 13, 2003 powers of attorney, Mr. Beyer named Craig Plassmeyer as Mr. Beyer's attorney-in-fact and granted him: (1) full power and authority to do everything necessary to transfer, assign, convey, and deliver to the Living Trust [one of the revocable grantor trusts that Mr. Beyer was to create] any interest in property owned by Mr. Beyer, (2) the power to make health care decisions on behalf of Mr. Beyer, and (3) the power to act on Mr. Beyer's behalf in the event of his disability.

In order to implement the estate planning strategies that Mr. Beyer had chosen, on October 13, 2003, Mr. Beyer also signed a trust agreement (Living Trust agreement) that Madonia & Associates had prepared for him and thereby formed the revocable grantor trust that he named the Edward G. Beyer Living Trust (Living Trust), which was to be the limited partner of the limited partnership. In the Living Trust agreement, Mr. Beyer named himself, Craig Plassmeyer, and Bruce Plassmeyer as the three co-trustees of the Living Trust. The Living Trust agreement provided in pertinent part:

**Article One**
**Establishing My Trust**

The date of this trust agreement is October 13, 2003. The parties to this agreement are EDWARD G. BEYER (the "Trustmaker") and EDWARD G. BEYER, CRAIG PLASSMEYER and BRUCE PLASSMEYER (collectively, the "Trustee").

**Section 1.01　　　Identifying My Trust**

My trust may be referred to as "EDWARD G. BEYER, CRAIG PLASSMEYER, and BRUCE PLASSMEYER Trustees of the EDWARD G. BEYER LIVING TRUST dated October 13, 2003, and any amendments thereto."

For the purpose of transferring property to my trust, or identifying my trust in any beneficiary or pay-on-death designation, any description referring to my trust shall be effective if it reasonably identifies my trust. Any description that contains the date of my trust, the name of at least one initial or successor Trustee and an indication that my Trustee is holding the trust property in a fiduciary capacity shall be sufficient to reasonably identify my trust.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

**Section 1.03　　　Transferring Property to My Trust**

Any person or entity may transfer property of any kind, nature and description to my trust in any manner authorized by law.

**(a)　　Initial Funding of My Trust**

By execution of this agreement, I transfer, convey and assign to my Trustee and my Trustee accepts and agrees to hold, the property described in Schedule A, annexed hereto, together with all my right, title and interest in and to all of my property that may by law be held in trust and

that may, by this assignment, be transferred to my trust. This assignment shall include, without limitation, all real and personal, tangible and intangible property, located in the United States, whether separate or community, whether acquired before or after the execution of this agreement except for the following assets that are expressly not transferred to my trust by this assignment:

Life insurance policies, unless the ownership of a policy is transferred to my trust by a separate instrument that specifically refers to such policy;

Corporate and self-employed ("Keogh") pension, profit sharing and stock bonus plans;

Simplified Employee Plans (SEPs);

Individual retirement accounts and tax sheltered annuities;

Commercial annuities;

Any property the transfer of which would violate a restriction on transfer agreement.

\*        \*        \*        \*        \*        \*        \*

## Section 1.04        Powers Reserved by Me as Trustmaker

During my lifetime, I shall retain the powers set forth in this Section in addition to any powers that I reserve in other provisions of this agreement.

### (a)        Action on Behalf of My Trust

During any period that I am serving as a Trustee of my trust, I may act for and conduct business on behalf of my

trust without the consent of any other Trustee.

### (b)     Amendment, Restatement or Revocation

I have the absolute right, at any time and from time to time, to amend, restate, or revoke any term or provision of this agreement in whole or in part.  Any amendment, restatement, or revocation must be in a written instrument signed by me.

### (c)     Addition or Removal of Trust Property

I have the absolute right, at any time and from time to time, to add to the trust property and to remove any property from my trust.

### (d)     Control of Income and Principal Distributions

I have the absolute right to control the distribution of income and principal from my trust.  My Trustee shall distribute to me, or to such persons or entities as I may direct, as much of the net income and principal of the trust property as I deem advisable.  My Trustee may distribute trust income and principal to me or for my unrestricted use and benefit, even to the exhaustion of all trust property.  Any undistributed income shall be added to the principal of my trust.

### (e)     Approval of Investment Decisions

I have the absolute right to approve my Trustee's investment decisions.  My approval of investment decisions shall be binding on all other beneficiaries of this agreement.

**[*23] Section 1.05          Grantor Trust Status**

By reserving the broad rights and powers set forth in Section 1.04 of this Article, I intend to qualify my trust as a "Grantor Trust" under Sections 671 to 677 of the Internal Revenue Code so that, for federal income tax purposes, I will be treated as the owner during my lifetime of all the assets held in my trust as though I held them in my individual capacity.

During any period that my trust is a Grantor Trust, the taxpayer identification number of my trust shall be my social security number, in accordance with Treasury Regulation Section 301.6109-1(a)(2).

\*          \*          \*          \*          \*          \*          \*

**Article Three**
**Trustee Succession Provisions**

\*          \*          \*          \*          \*          \*          \*

**Section 3.02          Trustee Succession During My Lifetime**

During my lifetime, this Section shall govern the removal and replacement of my Trustees.

**(a)     Removal and Replacement by Me**

I may remove any Trustee with or without cause at any time.  If a Trustee is removed, resigns or cannot continue to serve for any reason, I may serve as sole Trustee, appoint a Trustee to serve with me or appoint a successor Trustee.

**(b)     During My Incapacity**

During any time that I am incapacitated, the following

shall replace any then serving Trustee in the order named:

> CRAIG PLASSMEYER and BRUCE PLASS-MEYER, to serve as Co-Trustees; and then GUARANTY TRUST

If I am incapacitated, a majority of the income beneficiaries, may remove any Trustee with or without cause.

If I am incapacitated and there is no named successor Trustee, a majority of the income beneficiaries shall appoint an individual or a corporate fiduciary to serve as my successor Trustee.

All appointments, removals and revocations shall be by signed written instrument.

\*     \*     \*     \*     \*     \*     \*

## Article Five
## Administration of My Trust Upon My Death

### Section 5.01        My Trust Shall Become Irrevocable

Upon my death, my trust shall become irrevocable and my social security number may no longer be used to identify my trust. My Trustee shall apply for a separate taxpayer identification number for my trust.

### Section 5.02        Administrative Trust

After my death and prior to the distribution of trust property as provided in the subsequent Articles of this agreement, my trust shall be an administrative trust but may continue to be known as the EDWARD G. BEYER LIVING TRUST. My administrative trust

[*25] shall exist for a reasonable period of time necessary to complete the administrative tasks set forth in this Article.

**Section 5.03     Payment of My Expenses and Taxes**

My Trustee is authorized but not directed to pay from the administrative trust:

> Expenses of my last illness, funeral and burial or cremation, including expenses of memorials and memorial services;
>
> Legally enforceable claims against me or my estate;
>
> Expenses of administering my trust and my estate; and
>
> Court ordered allowances for those dependent upon me.

These authorized payments are discretionary with my Trustee. My Trustee may make decisions on these payments without regard to any limitation on payment of such expenses imposed by law and may make payments without obtaining the approval of any court. No third party may enforce any claim or right to payment against my trust by virtue of this discretionary authority. My Trustee shall not pay any administrative expenses from assets passing to an organization that qualifies for the federal estate tax, charitable deduction or to a split-interest charitable trust.

My Trustee shall pay death taxes out of the principal of the trust property as provided in Section 5.05. If, however, a probate estate is opened within six months from the date of my death, my independent executor shall pay claims expenses and death taxes from my probate

estate to the extent that the cash and readily marketable assets included in my probate estate are sufficient to pay such items unless my Trustee has already paid them.

\*        \*        \*        \*        \*        \*        \*

## Section 5.05        Payment of Death Taxes

For the purposes of this Article, the term "death taxes" shall refer to any taxes imposed by reason of my death by federal, state or local authorities, including but not limited to estate, inheritance, gift, and direct-skip generation-skipping transfer taxes.  For purposes of this Section, death taxes shall not include any additional estate tax imposed by Section 2031(c)(5)(C), Section 2032A(c) or Section 2057(f) of the Internal Revenue Code or any other comparable recapture tax imposed by any taxing authority.  Nor shall death taxes include any generation-skipping transfer tax, other than a direct skip [sic] generation-skipping transfer tax.

Except as otherwise provided in this Section or elsewhere in this agreement, my Trustee shall provide for payment of all death taxes from the administrative trust [reference to Living Trust after Mr. Beyer's death] without apportionment.  My Trustee shall not seek contribution toward or recovery of any such payments from any individual.

\*        \*        \*        \*        \*        \*        \*

### Article Six
### Specific Distributions and
### Disposition of Tangible Personal Property

## Section 6.01        Specific Distribution to RUTH E. PLASS-MEYER and LUCILLE V. WILKINSON

Upon my death, my Trustee shall hold the sum of $325,000 and the proceeds from the Value Line Tax Exempt Fund, Account number

[*27] * * * [ending] 326 in trust for the benefit of RUTH E. PLASSMEYER and LUCILLE V. WILKINSON to be administered as provided in this Section.

If RUTH E. PLASSMEYER and LUCILLE V. WILKINSON should predecease me, this distribution shall lapse and the property subject to this distribution shall instead be distributed under the other provisions of this agreement.

Property passing under this Section shall pass free of any administrative expenses or death taxes.

My Trustee shall administer the amount set aside for RUTH E. PLASSMEYER and LUCILLE V. WILKINSON as follows:

### (a) Distributions of Income and Principal

My Trustee shall distribute to RUTH E. PLASSMEYER and LUCILLE V. WILKINSON as much of the income and principal of their trust as my Trustee determines is necessary or advisable for the cost and expenses (except for telephone and electric bills) of maintaining the condominiums they each reside in and their respective garages.

The proceeds from the Value Line Tax Exempt Fund are to pay each of RUTH E. PLASSMEYER and LUCILLE V. WILKINSON the amount of $800.00 per month for as long as they shall live.

Any undistributed net income shall be accumulated and added to principal.

**(b)**     **Distribution Upon the Death of**
    **RUTH E. PLASSMEYER and**
    **LUCILLE V. WILKINSON**

If the survivor of RUTH E. PLASSMEYER and LUCILLE V. WILKINSON should die before the complete distribution of their trust, my Trustee shall distribute the trust assets to CRAIG PLASSMEYER into the trust created for his benefit in Article Nine herein.  If CRAIG PLASSMEYER is deceased the property shall pass to CRAIG PLASSMEYER's descendants, per stirpes in trust.  If CRAIG PLASSMEYER has no descendants, my Trustee shall distribute the balance of the trust property as provided in Article Ten of this agreement.

**Section 6.02**     **Life Estate in Real Property**

I bequeath unto my sister, RUTH E. PLASSMEYER, a life estate in the property where she currently resides, commonly known as 4125 N. Keystone, Unit 502, Chicago, Illinois, 60644, as well as the 2 parking spaces that were sold with said unit.  I bequeath unto my sister, LUCILLE V. WILKERSON, a life estate in the property where she currently resides, commonly known as 4125 N. Keystone, Unit 603, Chicago, Illinois, 60644, as well as the parking space that was sold with said unit.  RUTH and LUCILLE shall be referred to as "Life Tenant" for their respective life estates under this article.  The Life Tenant shall have the right, rent free, to the exclusive use, possession and enjoyment as a personal residence of the Property during her lifetime.

The trust held under this Article shall terminate upon the death of the Life Tenant, and the Trustee shall thereupon dispose of the principal of the trust estate, as it is then constituted, by adding all assets owned by the respective life estates to the trust share made for the benefit of CRAIG PLASSMEYER under Article 9.01 herein.  The assets

contained in the respective life estates are in addition to the assets provided for CRAIG PLASSMEYER UNDER Article 9.01 hereof.

\*     \*     \*     \*     \*     \*     \*

## Article Eight
## Distribution-of My Exempt Trust Property

My Trustee shall administer the Exempt Share as provided in this Article.

### Section 8.01     Division of My Exempt Trust Property

My Trustee shall divide the remaining exempt trust property into shares as follows:

| Name | Relationship | Share |
|------|--------------|-------|
| CRAIG PLASSMEYER | Nephew | 40% |
| BRUCE PLASSMEYER | Nephew | 40% |
| DORIS KAMINSKI | Niece | 20% |

\*     \*     \*     \*     \*     \*     \*

## Article Nine
## Distribution of My Nonexempt Property

My Trustee shall administer the Nonexempt Share as provided in this Article.

### Section 9.01     Division of Remaining Nonexempt Trust Property

My Trustee shall divide the remaining nonexempt into shares as follows:

[*30]

| Name | Relationship | Share |
|---|---|---|
| CRAIG PLASSMEYER | Nephew | 40% |
| BRUCE PLASSMEYER | Nephew | 40% |
| DORIS KAMINSKI | Niece | 20% |

\*    \*    \*    \*    \*    \*    \*

**Schedule A**[10]

Ten Dollars Cash

At no time did Mr. Beyer amend the Living Trust agreement to eliminate the Living Trust's obligation, as set forth in section 5.03 and 5.05 of article five of that agreement, to pay so-called death taxes that would be due after he died (death taxes).

In order to implement the estate planning strategies that Mr. Beyer had chosen, on October 13, 2003, Mr. Beyer also signed a trust agreement (Management Trust agreement) that Madonia & Associates had prepared for him and thereby formed the revocable grantor trust that he named the Edward G. Beyer Management Trust (Management Trust), which was to be the general partner of the limited partnership. In the Management Trust agreement, Mr. Beyer named

---

[10]Schedule A is attached to the Living Trust agreement.

[*31] Craig Plassmeyer and Bruce Plassmeyer as the two co-trustees of the Management Trust.[11] The Management Trust agreement provided in pertinent part:

**Article One**
**Creation of the Trust**

**Section 1.01.          Establishment of the Trust**

This Management Trust is settled, established and dated October 13, 2003, by EDWARD G. BEYER as Trustmaker, and the following initial Trustees:

> CRAIG PLASSMEYER and BRUCE PLASSMEYER to serve as Co-Trustees

All references to "the trust" or "trust," unless otherwise stated, shall refer to this Management Trust and any trusts created in it. All references to "Trustee" shall refer to the initial Trustee or Trustees, or their successor or successors in trust.

When the term "Trustmaker" is used in this trust, it shall have the same legal meaning as "Grantor," "Settlor," "Trustor," or any other term referring to the maker of a trust.

This trust is intended to be a Grantor Trust within the meaning of Sections 671 - 679 et seq. of the Internal Revenue Code and the Regulations thereunder.

---

[11]Craig Plassmeyer and Bruce Plassmeyer remained the co-trustees of the Management Trust at all relevant times, including after Mr. Beyer died.

**[\*32] Section 1.02.        The Name of the Trust**

For convenience, the trust shall be known as the:

> EDWARD G. BEYER MANAGEMENT TRUST, dated
> October 13, 2003

For purposes of titling assets, beneficiary designations or transfer of assets directly to the trust, the trust shall be referred to as:

> CRAIG PLASSMEYER and BRUCE PLASSMEYER,
> Co-Trustee, or the successors in trust, under the
> EDWARD G. BEYER MANAGEMENT TRUST, dated
> October 13, 2003, and any amendments thereto.

In addition to the above descriptions, any description for referring to this trust shall be effective to transfer title to the trust or to designate the trust as a beneficiary as long as that format includes the date of this trust, the name of at least one initial or successor Trustee, and any reference that indicates that assets are to be held in a fiduciary capacity.

**Section 1.03.        Trust Term**

This trust is intended to exist for a limited term of years.  Unless earlier revoked by the beneficiaries, the trust will terminate at the 31st day of December of the year in which the last partnership, limited liability company, corporation or other entity owned by this trust has ended unless extended by the unanimous consent of the Trustees and the consent of a majority in interest of the then existing current income beneficiaries.

In no event shall the trust term extend beyond the limitation period imposed by the Rule Against Perpetuities as provided in Section 11.01 of this Agreement.

**[*33] Section 1.04.        Amendment and Revocation**

While the Trustmaker is alive, the Trustmaker shall have the sole and exclusive right to amend and revoke this trust, in whole or in part at any time.  Any amendment or revocation must be in writing, signed by the Trustmaker, and delivered to the Trustee.  This trust shall become irrevocable upon the death of the Trustmaker.

The right to amend or revoke this trust is personal to the Trustmaker, and may not be exercised by any legal representative or agent acting on the Trustmaker's behalf.

**Section 1.05.        Trustmaker's Liability**

The Trustmaker shall have no liability for the acts of the trust serving as General Partner or Managing Partner of any partnership.  Likewise, the Trustmaker shall have no liability for the acts of the trust serving as a Member or Managing Member or Manager of any Limited Liability Company.

*        *        *        *        *        *        *

**Article Two**
**Trust Purposes**

**Section 2.01.        General Purpose**

The trust is specifically established and settled to serve as a partner of one or more general or limited partnerships and as a member of one or more limited liability companies.  The trust is specifically authorized to serve as general partner of a limited partnership, as a

**[*34]** managing partner of a general partnership, and as a manager of a limited liability company.

    \*        \*        \*        \*        \*        \*        \*

### Article Three
### Funding the Trust

**Section 3.01.**    **Initial Funding**

The Trustmaker transferring, assigning shall initially fund the trust, and conveying all right, title, and interest in and to all of the property list in *Schedule "A"* attached hereto.

    **a.**    **Reliance by Third Parties**

    Upon presentation by the Trustee of a copy this Article of this trust and a separate Affidavit or Certificate of Trust stating the name and address of the current Trustee(s), affirming that the trust is in full force and effect, along with copies of any pertinent provisions of the trust, all third parties shall rely on this transfer and follow all of the Trustee's instructions without risk of incurring any liability to the Trustmaker, the Trustee, or the beneficiaries.

    **b.**    **Specific Transfers of Property**

    Any other person in any manner may additionally fund the trust with property interests of all kinds. All property interests assigned, conveyed, or delivered to the Trustee must be

acceptable to and acceptable by the Trustee to become trust property.

\*      \*      \*      \*      \*      \*      \*

## Article Four
### Beneficial Ownership of the Trust and Trust Distributions

**Section 4.01.      Beneficiaries and Beneficial Ownership**

While the Trustmaker is alive, the Trustmaker shall be the sole beneficiary of this trust, and the Trustee shall pay to the Trustmaker, at least quarterly, all of the net income and net capital gains from the trust.  If the Trustmaker is alive when the trust terminates, or if the Trustmaker revokes this trust the Trustee shall distribute all the trust property and any accrued and undistributed income and gains to the Trustmaker.

Following the death of the Trustmaker, the beneficiaries of the trust and the extent of their beneficial interest in the trust shall be maintained on *Schedule "B"* of the trust instrument and incorporated in its entirety as an integral part of this trust agreement.

*Schedule "B"* shall specifically state:

   a.      The name of each beneficiary of the trust;

   b.      The percentage beneficial ownership of each trust beneficiary; and

   c.      The remainder beneficiary, if any.  The term "remainder beneficiary," when used in the singular, refers to the person or persons, trust or trusts, or other entities entitled to the designated beneficial share or interest in the trust upon the death of the beneficial owner.  The interest of a remainder beneficiary is to continue in trust for the

stated remaining term of this trust.  Any share or interest of a remainder beneficiary is to be distributed to the remainder beneficiary upon the termination of the trust.

The Trustee shall update *Schedule "B"* to show changes in any of the categories listed above.

### Section 4.02.          Change of Beneficiary Designations

Unless otherwise prescribed by this trust instrument, the Trustmaker has the unilateral right to change the beneficiary designation or remainder beneficiary designation of the trust at any time.

However, if the Trustmaker makes an irrevocable designation of beneficiary, the Trustmaker making an irrevocable designation (or who releases the power to re-designate the beneficiary) cannot thereafter change the designation of trust beneficiary or the designation of the remainder beneficiary.

### Section 4.03.          Remainder Beneficiary Interests

The term "remainder beneficiary," used in the singular, is the person, persons, trust, trusts, or other entities entitled to the designated share or interest in the trust upon the death of the beneficial owner.

The interest of a remainder beneficiary shall continue in trust for the remaining stated term of this trust and be distributed to the remainder beneficiary only upon termination of the trust.  If the remainder beneficiary is a trust that will end or in fact does end before the termination of this trust, then the beneficiaries of the remainder beneficiary trust shall become the remainder beneficiaries of this trust.

**[*37] Section 4.04.          Distributions of Income and Principal**

Except as otherwise provided for herein, while the Trustmaker is alive, all items of income, gain, loss, deduction, depreciation, and credit of the trust shall be allocable and distributable to the Trustmaker.  However, all management service income, and costs of administration shall be allocated or distributed to the Trustee.

After the Trustmaker's death, the Trustee may, in the Trustee's sole and absolute discretion, allocate and distribute any items of non-management income, gains, losses, deductions, depreciation, and credits on a pro-rata basis to the remainder beneficiaries of the trust. Except for liquidation distributions provided for in Article Seven, until the termination of the trust, no principal (other than net capital gains) shall be distributable from this trust.

\*          \*          \*          \*          \*          \*          \*

**Article Six**
**Resignation, Replacement, and Succession of Trustees**

**Section 6.01.          The Resignation of a Trustee**

A Trustee may resign by giving thirty days written notice to all of the beneficiaries then eligible to receive mandatory or discretionary distributions of net income from any trust created under this agreement.

If a beneficiary is a minor or is legally incapacitated, the notice shall be delivered to that beneficiary's guardian or other legal representative.

**[\*38] Section 6.02.          The Removal of a Trustee**

Any Trustee may be removed as follows:

**a.          Removal by Trustmaker**

The Trustmaker reserves the right to remove any Trustee at any time, with or without cause.

**b.          Removal by Beneficiaries**

After the death of the Trustmaker, a majority of the beneficiaries then eligible to receive mandatory or discretionary distributions of net income under this agreement may remove and replace any Trustee.

\*          \*          \*          \*          \*          \*          \*

**Section 6.03.          Replacement of Trustees**

Whenever a Trustee is removed, dies, resigns, becomes legally incapacitated, or is otherwise unable or unwilling to serve, that Trustee shall be replaced as follows:

**a.          The Death or Disability of a Trustee While the Trustmaker is Serving as Trustee**

The Trustmaker may serve as the only Trustee or the Trustmaker may name any number of Trustees to serve as Co-Trustees or as replacement Trustees.  If any of these other Trustees subsequently die, resign, become legally incapacitated, or are otherwise unable or unwilling to serve as a Trustee, the Trustmaker may or may not fill the vacancy.

**[*39]**     **b.     Resignation of a Trustmaker as Trustee**

If the Trustmaker resigns as Trustee, the resigning Trustmaker may appoint a successor Trustee to serve in his place.

Notwithstanding anything in this agreement to the contrary, the resigning Trustee may provide that his appointed successor Trustee may appoint his or their successor.

**Section 6.04.     Trustee Succession**

If the Trustmaker fails to appoint a successor or successors as Trustee, or if an appointed Trustee is unwilling or unable, or cannot continue to serve for any reason and no appointed successor has been designated, then the following shall be named as successor Trustees in the order in which their names appear:

CRAIG PLASSMEYER and BRUCE PLASSMEYER, as Co-Trustees

GUARANTY TRUST COMPANY

\*          \*          \*          \*          \*          \*          \*

**Article Nine**
**General Matters and Instructions**
**with Regard to the Trusteeship**

\*          \*          \*          \*          \*          \*          \*

**Section 9.09.     A Majority of Trustees Required to Control**

When more than two Trustees are acting, the concurrence and joinder of a majority of Trustees shall control in all matters pertaining to the administration of any trust created under this agreement.

[*40] If only two Trustees are acting, the concurrence and joinder of both shall be required.

\*       \*       \*       \*       \*       \*       \*

### Schedule A[12]
### Initial Funding

Original Contribution of Capital:          $ [no amount listed]

Designated Percentage of Ownership:          100%

### Schedule B[13]
### Trust Beneficiaries

**Trustmaker**                    EDWARD G. BEYER

Designated Present Beneficiary          EDWARD G. BEYER

Designated Remainder Beneficiary          The EDWARD G. BEYER LIVING TRUST, dated October 13, 2003

The Management Trust did not maintain a bank account until its co-trustees opened one in October 2009, over two years after Mr. Beyer died.

In order to implement the estate planning strategies that Mr. Beyer had chosen, on October 13, 2003, Mr. Beyer, acting on behalf of the Living Trust (the limited partner), and Craig Plassmeyer and Bruce Plassmeyer, acting on behalf of the Management Trust (the general partner), signed a limited partnership

---

[12]Schedule A is attached to the Management Trust agreement.

[13]Schedule B is attached to the Management Trust agreement.

[*41] agreement (EGBLP agreement) that Madonia & Associates had prepared

and thereby formed under Illinois law the limited partnership that they named the

Edward G. Beyer Limited Partnership (EGBLP).[14]  The EGBLP agreement

provided in pertinent part:

## Article One
## Creation of the Partnership

**Section 1.01.          The Limited Partnership**

This agreement, which is dated October 13, 2003, forms and
establishes a Limited Partnership under the laws of the State of
Illinois, and specifically under the auspices of the Uniform
Partnership Act 805 ICLS 205.  The Partnership shall be effective
upon the filing of a Certificate of Limited Partnership as required by
the State of Illinois.[15]  The Partners and their percentages of
ownership are identified in the schedule attached to this agreement as
Exhibit "A."

This agreement sets forth the rights, duties, obligations, and
responsibilities of the Partners with respect to the partnership.

---

[14]At all relevant times, the sole general partner of EGBLP was the
Management Trust.  At all relevant times until December 30, 2005, the sole
limited partner of EGBLP was the Living Trust.

[15]Sometime after October 13, 2003, and before February 18, 2004, EGBLP
filed a certificate of limited partnership with the secretary of state of Illinois.

**[*42]** In consideration of the mutual promises, obligations and agreements set forth in this agreement, the parties to this agreement agree to be legally bound by its terms.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

### Section 1.03.　　Purpose and Scope of the Partnership

This Partnership is organized to accomplish the following purposes:

a.　　To Make a Profit--The primary reason for creating this Limited Partnership is to make a profit.

b.　　To Increase Wealth--This Limited Partnership will provide an effective legal vehicle to increase the wealth of the partners and their families.

c.　　To Consolidate Fractional Interests--This Limited Partnership will consolidate fractional interests in the assets held by the various partners into one block of assets.

d.　　To Provide Centralized Management of Investments-- This Limited Partnership is designed to hold investment assets and allow for centralized management of those assets.

e.　　To Manage and Develop Real Estate--This Limited Partnership will provide the legal vehicle to effectively manage and/or develop any real estate owned or acquired by the Partnership.

f.　　To Reduce Estate Taxes--Because of the manner in which partnership interests are valued, this Limited Partnership may reduce the potential estate tax liability of the partners.

**[\*43]**  g.  To Facilitate the Making of Intra-Family Loans--The General Partner may make loans to family members and provide for a variety of repayment options.

h.  To Avoid Two Layers of Taxation on Profits--This Limited Partnership provides flexibility in business planning not available to the Partners through trusts, corporations, or other business entities.

i.  To Acquire Assets That S Corporations Cannot Hold-- This Limited Partnership provides flexibility in the management of family business because it is permitted to own assets that cannot be held by S Corporations.

j.  To Avoid Compressed Income Tax Rates on Trusts-- This Limited Partnership is not subject to compressed income tax rates that apply to some irrevocable trusts.

k.  To Reduce State Taxes--Limited partnerships are not subject to franchise tax in some states where the Partnership may choose to do business, unlike corporations and limited liability companies that generally do pay a franchise tax.

l.  Reduce Income Taxes--Income tax may be reduced because income distributed to limited partners is generally not subject to self-employment tax.

m.  To Make Gifts Without Fractionalizing Assets--This Limited Partnership establishes a method by which annual gifts may be made without fractionalizing family assets.

n.  To Make Gifts Without Causing a Loss of Incentive-- This Limited Partnership provides a method of ownership which allows gifts to be made to children and

other beneficiaries without causing a loss of productivity or the incentive to strive to do well.

o.   To Control Cash Flow to Limited Partners--This Limited Partnership provides a structure by which the general partner can control the assets and the cash flow to Limited Partners to achieve the legitimate purposes of the Partnership.

p.   To Resolve Disputes Privately--This Limited Partnership provides for mediation and binding arbitration in disputes by partners that is intended to prevent expensive and embarrassing public litigation of private family business matters.

q.   To Require the Losers of Disputes to Pay the Dispute Costs--This Limited Partnership requires the loser in any dispute to pay for the costs of the dispute.

r.   To Provide Confidentiality--This Limited Partnership contains confidentiality provisions restricting family members from publicly disclosing matters involving private family business.

s.   To Avoid Probate--The Partnership is intended to assist in preventing family assets from going through probate upon the disability or death of any family member; or alternatively, to simplify any probate proceeding that may be required.

t.   To Establish an Order of Succession--This Limited Partnership establishes and maintains an order of succession and control of family business assets.

u.   To Restrict the Right of Non-Partners to Acquire Interests--This Limited Partnership restricts the right of non-partners to acquire interests in Partnership assets.

**[*45]**

v. To Prevent Transfers of Partnership Interests Because of Failed Marriages--This Limited Partnership prevents the transfer of a family member's interest in the Partnership because of a failed marriage.

w. To Prevent Commingling of the Assets of Gift Recipients--This Limited Partnership creates a method of ownership that will prevent gifts made to family members from being commingled with assets owned by others.

x. To Protect Partners from the Partnership's Creditor Claims--This limited partnership limits the liability of Limited Partners from the Partnership's creditors.

y. To Provide Asset Protection for Partners--This Limited Partnership protects the family resource base from the claims of future creditors of Partners.

z. To Promote Knowledge of Family Assets--This Limited Partnership promotes knowledge of and communication about the family assets and business among family members.

aa. To Reduce the Impact of Income in Respect of a Decedent--This Limited Partnership may help the partners reduce the impact of the income in respect of a decedent (IRD) upon the death of a partner because the partnership year closes on the death of a partner.

bb. To Keep Family Members Close--This Limited Partnership will require family members to continue to maintain a relationship over a long period of time in order to effectively manage the assets of the Partnership, and accordingly, may provide a business structure that will reduce the likelihood of family disputes and allow

**[*46]**  the family members to maintain a close relationship over a long period of time.

The Partnership may conduct any lawful business and investment activity permitted under the laws of the State of Illinois and in any other nation or political subdivision in which it may have a business or investment interest.

The Partnership may own, acquire, manage, develop, operate, sell, exchange, finance, refinance, lease and otherwise deal with real estate, personal property and any type of business as the General Partner may from time to time deem to be in the best interest of the Partnership.

The Partnership may engage in any other activities that are related or incidental to the foregoing purposes.

**Section 1.04.      Purpose of Partnership Restrictions**

This Partnership is formed by those who know and trust one another, and who in forming this Limited Partnership will have surrendered certain management rights. One or more of the Partners may also have assumed management responsibility and risk based upon their relationship and trust.

Capital is material to the business and investment objectives of the Partnership and its federal tax status.  An unauthorized transfer of a Partner's interest could create a substantial hardship to the Partnership, jeopardize its capital base, and adversely affect its tax structure.

There are, therefore, certain restrictions, as expressed in this agreement, that attach to and affect both ownership of Partnership Interests and the transfer of those interests.  Those restrictions upon ownership and transfer are not intended as a penalty, but as a method to protect and preserve existing relationships based upon trust and to

**[*47]** protect the Partnership's capital and its financial ability to continue to operate.

\*         \*         \*         \*         \*         \*         \*

### Section 1.07.        The Term of the Partnership

The period of duration of the Partnership shall be perpetual.  The Partnership shall begin on the date the Certificate of Limited Partnership is filed with the Secretary of State of Illinois and shall continue until terminated or dissolved in accordance with the provisions of this agreement.

### Section 1.08.        The Tax Matters Partner

The General Partner shall serve as the Tax Matters Partner pursuant to the Code.  If there is more than one General Partner, the General Partners shall, by agreement, designate one of the General Partners to serve as the Tax Matters Partner.

\*         \*         \*         \*         \*         \*         \*

### Article Three
### Partnership Interests

### Section 3.01.        Percentage interest in the Partnership

Each Partner's Initial Partnership Interest shall be the percentage interest set forth in Exhibit "A" that is attached to this agreement. Partnership Interests shall be adjusted from time to time to account for non-*pro rata* Additional Capital Contributions and non-*pro rata* distributions to Partners.  When non-*pro rata* contributions or distributions are made, each Partner's partnership interest shall then be determined by dividing the Capital Account of each Partner by the aggregate of the then existing capital accounts, after adjusting the Partners' Capital Accounts to reflect the fair market value of the contributed property.

[*48] For purposes of determining the respective voting rights of the Partners, adjustments to Partnership Interests of the Partners resulting from Additional Contributions or Distributions shall be deemed to have been made on December 31 following the date of the contribution or distribution.

The General Partner of Partnership shall maintain a correct record of all Partners and their Partnership Interests together with amended and revised schedules of ownership caused by changes in the Partners and changes in Partnership Interests.

\*         \*         \*         \*         \*         \*         \*

## Article Four
## Capital Contributions and Capital Accounts

**Section 4.01.        Initial Capital Contributions**

The Partners shall contribute as their initial capital contributions to the Partnership all of their right, title and interest in and to the property described in Exhibit A attached hereto.  The Partners agree that the property described in Exhibit A has the fair market value (net of liabilities assumed or taken subject to by the Partnership to which such property is subject) listed opposite such property.

Each Partner's Interest shall be credited with an initial contribution equal to the fair market value listed opposite that Partner's name in Exhibit A.

\*         \*         \*         \*         \*         \*         \*

**Section 4.05.        Establishment of Capital Accounts**

A Capital Account shall be established for each Partner and shall be maintained at all times throughout the existence of the Partnership in a manner that complies with the Code and Regulations promulgated

[*49] thereunder. Each Partner's Capital Account shall be maintained according to the following provisions:

### a.    Credits to Partner's Interest

Each Partner's Interest shall be credited with the fair market value of such Partner's contribution of cash or other property, such Partner's distributive share of profits, and the amount of any Partnership liabilities that are assumed by such Partner.

### b.    Debits to Partner's Interest

Each Partner's Interest shall be debited the amount of cash and the fair market value of any property distributed to such Partner pursuant to any provision of this agreement, such Partner's share of losses, and the amount of any liabilities of such Partner that are secured by any property contributed by such Partner to the Partnership.

### Section 4.06.    Assignment of a Partner's Interest

Except as otherwise required by the Code or Regulations, if any Partnership Interest is assigned according to the terms of this agreement, the Assignee shall succeed to the Capital Account of the assignor to the extent that it relates to the assigned Partnership Interest. If the assignment of an interest in the Partnership causes a termination of the Partnership under Code Section 708(b)(1)(B), the capital account that carries over to the Assignee will be adjusted according to Treas. Reg. Section 1.704-1(b)(2)(iv)(e).

### Section 4.07.    Capital Account Adjustments for Capital Events

The following capital events shall result in the following adjustments to a Partner's Capital Account.

**[*50]**      **a.     Assumption of Liability**

An assumption of unsecured liability by the Partnership shall be treated as a distribution of money to the Partner, and his Capital Account shall be adjusted accordingly.  An assumption of an unsecured liability of the Partnership by a Partner shall be treated as a cash contribution to the Partnership.  In determining the amount of any liability for this purpose, Section 752(c) of the Internal Revenue Code and the Treasury Regulations promulgated thereunder shall be taken into account.

**b.     Adjustments for Noncash Distributions**

If the assets of the Partnership other than cash are distributed in kind to a Partner, the Capital Accounts of the Partners shall be adjusted for the hypothetical "book" gain or loss that would have been realized by the Partnership if the distributed assets had been sold for their fair market values in a cash sale in order to reflect unrealized gain or loss.

**c.     Adjustment to Fair Market Value Upon
          Transfer of Partnership Interest**

If an existing or new Partner acquires an Interest, the Capital Accounts of the Partners shall be adjusted to reflect fair market value of all properties held by the Partnership.

**d.     Adjustment for Constructive Termination of
          Partnership**

Capital Accounts shall be adjusted to reflect fair market value of all properties held by the Partnership as required by Treasury Regulation Section 1.704-1(b)(2)(iv)(b) upon the constructive

termination of the Partnership as provided under Section 708 of the Internal Revenue Code.

\* \* \* \* \* \* \*

## Article Five
## Allocations and Distributions

### Section 5.01. Allocation of Profits and Losses

The Partnership shall allocate all net profits and losses, which shall include every item of income, deduction, depreciation, gain, loss, and credit, for each calendar year of the Partnership, to each Partner *pro rata* in accordance with the Partner's respective Partnership Interest during the period over which such profits, losses and tax items were accrued. The Partners shall be bound by the provisions of this Article in reporting their shares of Partnership income and loss for income tax purposes.

Any Partnership net losses that cannot be allocated to one or more of the Partners without creating a negative Capital Account shall be allocated to the remaining Partners in proportion to their capital accounts until all Partners have a Capital Account of zero. To the extent that net losses were specially allocated to Partners with positive Capital Account balances during a period in which Partners with negative Capital Account balances were not allocated any net losses, subsequent net profits shall be first allocated to those Partners who were specially allocated net losses, to the extent of such net losses, and thereafter such net profits shall be allocated proportionately among the Partners according to their respective Partnership Interests.

Net losses allocated when all Partners have a Capital Account of zero shall be allocated proportionately among the Partners according to their respective Partnership Interests.

**[*52]** Allocation of net profits and net losses may be modified by subsequent agreement to conform to adjustments made to the Percentage Interests because of loans to the Partnership converted to contributions to capital, any distributions of cash and any liquidating distributions.

If the Percentage Interest of a Partner is not the same throughout a given fiscal year, the General Partner shall determine the allocation of net profits and net losses to the Partners taking into account the Partners' varying Percentage Interests during the year.  Such determination shall be in conformity with the requirements of Code Section 706(d) and Treasury Regulations promulgated thereunder.

\*          \*          \*          \*          \*          \*          \*

**Section 5.03.          Distributions to Partners**

The primary intent of the Partnership is to retain partnership funds in amounts determined in the sole and absolute discretion of the General Partner to meet the reasonable needs of the business or investments of the Partnership and other needs as provided in this agreement.

No Partner shall have the right to demand distributions of any Partnership funds or assets.  Distributions of funds or other Partnership assets, when made, shall be made as follows:

> **a.          Distributions of Cash**
>
> The General Partner may make distributions of Partnership cash to the Partners on *pro rata* or *non-pro rata* basis as the General Partner, in its discretion, shall determine.  Such distributions shall only be made from the cash reserves that exceed the reasonable working reserves of the Partnership as determined in the sole discretion of the General Partner.
>
> The General Partner, in its sole and absolute discretion, rather than making an actual distribution of Partnership assets to the

Partner, may elect to treat such distribution as a liability of the Partnership and execute a note to the Partner payable to the Partner at the termination of the Partnership. The note shall bear interest for any given month based on the Internal Revenue Service's published annual interest rate for taxpayer overpayments in effect on the first day of such month.

Subject to this agreement and applicable law, distributions of cash shall first come from cash from operations as permitted under this agreement, then from cash from the liquidation of the Partnership as provided in this agreement.

**b.     Distributions in Kind**

The General Partner, in its sole and absolute discretion, may make distributions in kind of Partnership property to the Partners. Prior to any such distribution in kind, the difference between such established fair market value and the book value of the property to be distributed shall be adjusted by a credit or charge, as is appropriate, to the Partners' Interests. Upon the distribution of such property, such adjusted value shall be charged to the Interests of the Partners receiving such distributions.

\*     \*     \*     \*     \*     \*     \*

**Article Six**
**Management of the Partnership**

**Section 6.01.     General Authority of the General Partner**

Subject to the specific rights given the Limited Partners in this agreement, all decisions respecting any matter affecting or arising out of the conduct of the business of the Partnership shall be made by the General Partner who shall have the exclusive right and full authority to manage, conduct, and operate the Partnership business.

**[*54]** The General Partner shall manage and administer the Partnership according to this agreement and to perform all duties prescribed for a General Partner by the laws of the State of Illinois.[16]

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

### a. Acts Requiring 85% Approval of Partnership Interests

The consent of 85% of all the Partnership Interests shall be required to do any of the following:

Prior to actual termination of the Partnership, sell substantially all of the property in liquidation or cessation of the business;

Confess a judgment against the Partnership;

File or consent to filing a petition for or against the Partnership under any federal or state bankruptcy, insolvency, or reorganization act;

Exercise an election under Section 754 of the Code.

### b. Acts Requiring Unanimous Approval of the Partners

The General Partner shall not have the power, without the unanimous written consent of all Partners, to do any of the following:

Except as otherwise provided, admit any substitute or additional Limited or General Partner into the Partnership.

---

[16]The information that follows in the quoted text appears to have been intended to be included under a heading labeled "**Section 6.06**" of the EGBLP agreement, which presumably would have been followed by a summary narrative description of the topic to which that section pertained. However, no heading appears in that agreement before that information.

**[*55]**    Except as provided in Section 15.03, amend this agreement.

Change or reorganize the Partnership into any other legal form.

Engage in any act that would subject any Limited Partner to liability as a General Partner.

Dissolve and liquidate the Partnership.

Distribute more than twenty-five percent (25%) of the fair market value of the Partnership's assets in any tax year.

Redeem, liquidate, purchase or otherwise acquire the Partnership Interest of any Partner.

Return the Capital Contribution of any Partner.

Contribute partnership property to a Charity.

Register any interest in this Partnership for an offering under any federal or state securities law.

*        *        *        *        *        *        *

**Article Seven**
**The General Partner**

**Section 7.01.        General Partner**

Each Partner shall manage and administer the property of the Partnership and * * * perform all other duties prescribed for a General Partner by the laws of the State of Illinois.  A General Partner will have personal liability for the obligations of the Partnership except as

[*56] may be specifically limited by the laws of the State of Illinois or any other jurisdiction in which the Partnership has qualified to do business.

\* \* \* \* \* \* \*

### c. Fiduciary Duty of General Partner

In carrying out the duties of the General Partner under this agreement, the General Partner shall act as a fiduciary for the Limited Partners and in its fiduciary capacity shall exercise the required standard of conduct with respect to the interest of the Limited Partners. Accordingly, the General Partner may not act in any manner contrary to this agreement; commingle Partnership funds; fail to disclose material facts involving transfers to and from the Partnership; take a Partnership opportunity for its own benefit; or derive a secret personal profit from dealing with the Partnership. The General Partner must account to the Partnership for any benefit, and hold as trustee for the Partnership any profits derived by the General Partner without the consent of the other Partners from any transaction connected with the formation, conduct, or liquidation of the Partnership, or from any use by it of Partnership property.

\* \* \* \* \* \* \*

### Article Eight
### The Limited Partners

\* \* \* \* \* \* \*

### Section 8.03.        No Right to Withdraw for a Limited Partner

No Limited Partner shall have the right to withdraw from the Partnership or to receive a return of any of its contributions to the Partnership until the Partnership is terminated and its affairs wound

[*57] up according to the Act and this agreement. A Limited Partner will breach this agreement if the Limited Partner:

Attempts to withdraw from the Partnership,

Interferes in the management of the Partnership affairs,

Engages in conduct which results in the Partnership losing its tax status as a partnership,

Engages in conduct that tends to bring the Partnership into disrepute,

Owns a Partnership Interest that becomes subject to a charging order, attachment, garnishment, or similar legal proceedings,

Breaches any confidentiality provisions of this agreement, or

Fails to discharge a legal duty to the Partnership.

A Limited Partner who is in breach of this agreement shall be liable to the Partnership for damages caused by the breach. The Partnership may offset for the damages against any distributions or return of capital to the Limited Partner who has breached this agreement.

\*       \*       \*       \*       \*       \*       \*

## Article Nine
## Books, Records, and Bank Accounts

**Section 9.01.          Books and Records**

The General Partner shall keep books of account with respect to the operation of the Partnership. Such books shall be maintained at the principal office of the Partnership, or at such other place as the General Partner shall determine, and all Partners and their duly authorized representatives shall, at all reasonable times, have access

[*58] to such books.  The following records of the Partnership shall be kept at its principal office where they shall be subject to inspection and copying at the reasonable request and the expense of any Partner during ordinary business hours:

> A current list of the full name and last known business address of each Partner, separately identifying the General Partners and the Limited Partners (in alphabetical order);
>
> A copy of the Certificate of Limited Partnership and all certificates of amendment thereto, together with executed copies of any powers of attorney pursuant to which any certificate has been executed;
>
> Copies of the Partnership's federal, state and local income tax returns and reports, if any, for the three most recent years;
>
> Copies of this agreement, as amended, and of any financial statements of the Partnership for the three most recent years; and
>
> Any other documents required by law.

**Section 9.02.        Accounting Basis and Fiscal Year**

The books of account of the Partnership shall be kept on a method authorized or required by the Code and as determined by the General Partner, and shall be closed and balanced at the end of each Partnership year.  The fiscal year of the Partnership shall be the

period authorized or required by the Code, and as determined by the General Partner.

\*  \*  \*  \*  \*  \*  \*

**Section 9.04.       Bank Accounts and Partnership Funds**

All cash receipts shall be deposited in the Partnership's bank or other depository accounts maintained by the General Partner.

**a.       Accounts Are Property of the Partnership**

All accounts used by or on behalf of the Partnership shall be and remain the property of the Partnership, and shall be received, held and disbursed by the General Partner for the purposes specified in this agreement.

**b.       No Commingling of Funds**

Partnership funds shall not be commingled with other funds.

\*  \*  \*  \*  \*  \*  \*

**Article Twelve**
**Transfer of Partnership Interests by a Limited Partner**

**Section 12.01.       Restrictions on Transfer**

Except as provided in this Article, a Limited Partner is prohibited from selling, assigning, transferring, mortgaging, pledging, encumbering, hypothecating or otherwise disposing of (collectively hereinafter referred to in this Article as "transferring" or "transfer", as the case may be) all or any part of any Limited Partnership Interest without the unanimous written consent of all the Partners.

[*60] The Partners shall have no obligation to give such consent, nor shall they be subject to liability for withholding consent.

**Section 12.02.     Transfer of Interest**

Each Limited Partner hereby agrees not to sell, assign, transfer, mortgage, pledge, encumber, hypothecate, or otherwise dispose of all or any part of its Partnership Interest without first offering in writing to sell such interest to the Partnership, and to all other Partners.  If the Partnership does not agree to purchase the Partnership Interest and none of the other Partners agree to purchase the Partnership Interest, then the Limited Partner who wants to sell, assign, transfer, mortgage, pledge, encumber, hypothecate, or otherwise dispose of all or any part of its Partnership Interest may offer it to a third party according to the terms of this Section.

**a.     Notice**

The transferring Limited Partner shall give written notice to the Partnership and to all other Partners that it desires to transfer its Partnership Interest.

**1.     Written Offer**

The transferring Limited Partner shall attach to the written notice any written offer of a prospective purchaser to buy the interest whether or not such offer is from an existing Partner.  This notice shall be complete in all details respecting the purchase price and terms of payment.

**2.     Genuine Offer**

The transferring Limited Partner shall certify in writing that the offer is genuine and in all respects what it purports to be.

**[*61]**     **b.     Right to Purchase**

The Partnership or the other Partners, as they shall agree, shall have the right either to purchase the Limited Partnership Interest in accordance with the terms of the written offer (except as modified below) by written notice to the transferring Limited Partner of its intent to purchase such interest, such notice to be delivered to the transferring Limited Partner within 90 days following the date on which the transferring Limited Partner's written offer is delivered to the Partnership at any time during the 30 days following the date on which the written offer is delivered to the Partnership.

If the Partnership and the other Partners cannot agree as to the identity of the purchaser, the Partnership shall have the sole right to purchase hereunder.  If such notice of intent to purchase is given, closing of the sale shall occur at the principal office of the Partnership (as designated in this agreement) within 120 days from the date of the notice of intent to purchase.

Payment of the purchase price shall be made, at the option of the Partnership or the purchasing Partners, as the case may be (1) upon the payment terms of the written offer or (2) by delivery of an unsecured promissory note made by the Partnership or the purchasing Partners, as the case may be, for the amount of the purchase price.  If a promissory note is given, such note shall bear interest at market rates for such notes on the unpaid balance of principal, principal to be payable in ten equal annual installments together with interest thereon, the first such installment to be due and payable on the first

**[*62]** anniversary of the note and subsequent installments to be due and payable on each anniversary date thereafter until the note is paid in full.  The terms of the note shall provide for prepayment of the note in whole or in part at any time without penalty and shall provide for a 60 day right to cure after notice of any default on payment before acceleration of the unpaid balance of principal and interest.

### c.    Right to Sell to Third Party

In the event the Partnership and the Partners elect not to purchase the selling Limited Partner's Partnership Interest, the transferring Limited Partner shall be free to transfer its interest to the prospective purchaser who made the genuine offer to the transferring Limited Partner for the purchase price, terms and conditions contained in the original genuine offer for a period of 60 days from the expiration of the 90 day period referred to in subsection b. above or the earlier date upon which the General Partner notifies the transferring Limited Partner in writing that the Partnership and the other Partners elect not to purchase such interest.  If the transferring Limited Partner's Partnership Interest is not sold to the prospective purchaser within the 60 day period, then the transferring Limited Partner may not transfer the transferring Limited Partner's Partnership Interest to the prospective purchaser without once again offering the Partnership Interest as provided in this Section.

If the transfer of the Limited Partner's Partnership Interest is not approved by all of the remaining Partners, then the transfer shall be only the interest of an Assignee.

**[*63] Section 12.03.    Transfer to Other Partners and Immediate Family Members**

A Limited Partner may transfer without the consent of any other Partner all or any portion of his or her Partnership Interest to another Partner.  Such transferred interest shall constitute only the interest of an Assignee unless all of the remaining Partners agree in writing that the transferred interest shall constitute a Limited Partnership Interest.

A Limited Partner may transfer with the consent of the General Partner, but without the consent of any other Limited Partner, all or any part of his or her Partnership Interest to a member of the Immediate Family of any Partner or to any Trust established primarily for the benefit of any member of the Immediate Family of a Partner or to a Charity or Charitable Trust.  Each such transfer shall convey only the interest of an Assignee unless all remaining partners agree in writing that the transferred interest shall constitute a Limited Partnership Interest.

### a.    Assignments to and from Trusts

A Limited Partner may, with the consent of the General Partner, but without the consent of any other Limited Partner, transfer all or any part of its Partnership Interest to any Trust in which the Partner or member of the Immediate Family of the Partner is a beneficiary.  A Limited Partner that is a Trust may assign all or any part of its Partnership Interest to any Immediate Family member of the Partner or trust established for the benefit of such Immediate Family member.  All such assignments shall convey only the interest of an Assignee

unless all remaining partners agree in writing that the transferred interest shall constitute a Limited Partnership Interest.

\* \* \* \* \* \* \*

### Article Fifteen
### General Matters

\* \* \* \* \* \* \*

**Section 15.08.     General Matters**

The following general matters of construction shall apply to the provisions of this agreement:

\* \* \* \* \* \* \*

**c.     Notices**

All notices required to be given in this agreement shall made in writing by either:

Personally delivering notice to the party requiring it, and securing a written receipt, or

Mailing notice by certified United States mail, return receipt requested, to the last known address of the party requiring notice, or

Electronic transmission by facsimile to the party requiring notice, provided that such party's receipt of same is confirmed in writing, or

Electronic mail transmission to the party requiring notice, provided that such party's receipt of same is confirmed in

**[*65]**    writing or by electronic mail transmission back to the sending party.

The effective date of the notice shall be the date of the written receipt or the date of the return receipt, if received, or if not, the date it would have normally been received via certified mail, provided there is evidence of mailing.

\*        \*        \*        \*        \*        \*        \*

**Exhibit A**[17]

**The Initial Partners and their Contributions to the Partnership**

| Partner's Name | Type of Interest | Contribution[1] | Value | % Interest |
|---|---|---|---|---|
| [Blank] | General | See Schedule A-1 | [Blank] | [Blank]% |
| [Blank] | Limited | See Schedule A-2 | [Blank] | [Blank]% |
| [Blank] | Limited | See Schedule A-3 | [Blank] | [Blank]% |
| [Blank] | Limited | See Schedule A-4 | [Blank] | [Blank]% |
| [Blank] | Limited | See Schedule A-5 | [Blank] | [Blank]% |

[1]EGBLP's agreement does not include any documents titled Schedules A-1, A-2, A-3, A-4, or A-5.

At no time after EGBLP was formed on October 13, 2003, was Exhibit A to the EGBLP agreement completed.

---

[17]Exhibit A is attached to the EGBLP agreement.

[*66] Around six months after the formation of EGBLP, Mr. Madonia sent an email dated April 2, 2004 (Mr. Madonia's April 2, 2004 email) to Craig Plassmeyer and Mr. Holup. In Mr. Madonia's April 2, 2004 email, Mr. Madonia recommended (1) that most of Mr. Beyer's securities be transferred to an account in EGBLP's name and (2) that Mr. Beyer's cash be left in his personal account. Mr. Madonia concluded in that email: "We need to establish to the IRS that Edward has enough assets outside of * * * [EGBLP] to live on, and, given Edward's modest lifestyle, I think 1.5M will do that."

At least as of April 2004, EGBLP had opened a brokerage account in its name at Banc One (EGBLP's Banc One account). On April 15, 2004, Mr. Beyer authorized and directed the transfer of certain assets from the 1999 Trust Banc One account to EGBLP's Banc One account. On April 20, 2004, Mr. Beyer's directive was implemented, and Banc One transferred (April 2004 transfer) the securities held in the 1999 Trust Banc One account to EGBLP's Banc One account, thereby funding EGBLP for the first time since its formation. (We shall refer to assets transferred from the 1999 Trust Banc One account to EGBLP's Banc One account as EGBLP's assets.)

After the April 2004 transfer, the following shares of stocks and of mutual funds were held in EGBLP's Banc One account:

[*67]

| Stock[1] | Number of Shares |
|---|---|
| Transocean Ltd. | 1,161 |
| Abbott Laboratories | 800,000 |
| Altria Group, Inc. | 2,400 |
| Arbitron, Inc. | 800 |
| Ceridian Corp. | 4,000 |
| Chevron Corp. | 462 |
| ConocoPhillips Co. | 525 |
| Constellation Energy Group | 1,800 |
| Edison Int'l | 2,000 |
| IBM | 4,000 |
| Mirant Corp. | 788 |
| Nicor, Inc. | 1,052 |
| PPL Corp. | 600 |
| Pepco Holdings, Inc. | 1,200 |
| Schlumberger Ltd. | 6,000 |
| Southern Co. | 1,984 |

| Mutual Funds | Number of Shares |
|---|---|
| Putnam Municipal Income Fund | 10,578.598 |

[1]We took judicial notice of the official names of the stocks listed above.

[*68] On April 15, 2004, Abbott had over 1.5 billion shares of stock outstanding. As of that date, the 800,000 shares of Abbott stock that Mr. Beyer contributed to EGBLP as part of his April 2004 transfer represented less than one percent of Abbott's total outstanding stock. EGBLP did not sell any of the 800,000 shares of Abbott stock that it held before Mr. Beyer died.

After Mr. Beyer's April 2004 transfer to EGBLP, he retained certain assets, in his name or in the name of the 1999 Trust. In addition, Mr. Beyer maintained at least two bank accounts in his name at Banc One (Mr. Beyer's Banc One accounts), a checking account and a so-called money market account. In July 2004, the name of the account holder of Mr. Beyer's Banc One accounts was changed from Mr. Beyer to the Living Trust (Living Trust Banc One account).

On January 6, 2005, Craig Plassmeyer, acting on behalf of the general partner of EGBLP (i.e., the Management Trust),[18] requested that Banc One issue a $20,000 check to be drawn on EGBLP's Banc One account to each of Bruce Plassmeyer and himself.[19] On March 14, 2005, Craig Plassmeyer, again acting on behalf of the general partner of EGBLP, requested that Banc One issue a $12,000

---

[18]Craig Plassmeyer was one of the two co-trustees of the Management Trust.

[19]The record does not establish the purpose for which Craig Plassmeyer, acting on behalf of the general partner of EGBLP, authorized the $20,000 payment to each of Bruce Plassmeyer and himself.

[*69] check to be drawn on EGBLP's Banc One account to each of Bruce

Plassmeyer and himself.[20]

Around a year after EGBLP was initially funded, Mr. Madonia raised again

certain additional estate planning strategies in an email dated March 21, 2005

(March 21, 2005 email) to Craig Plassmeyer.[21] Those strategies involved

(1) EGBLP's use of a restricted management account and (2) Mr. Beyer's

formation of an irrevocable trust and the Living Trust's sale to that newly formed

trust of its 99-percent limited partnership interest in EGBLP (99-percent limited

partnership interest) in exchange for that irrevocable trust's promissory note.

Mr. Beyer decided to implement the first step of one of the estate planning

strategies described in Mr. Madonia's March 21, 2005 email. On April 30, 2005,

Mr. Beyer signed a trust agreement (Beyer Irrevocable Trust agreement) that

---

[20]The record does not establish the purpose for which Craig Plassmeyer, acting on behalf of the general partner of EGBLP, authorized the $12,000 payment to each of Bruce Plassmeyer and himself.

[21]Mr. Madonia discussed with Mr. Beyer and/or Craig Plassmeyer some time before September 2, 2003, at least the second estate planning strategy described in his March 21, 2005 email to Craig Plassmeyer. The record contains a draft of an irrevocable trust agreement dated September 2, 2003, and another draft of an irrevocable trust agreement dated October 13, 2003, the date on which (1) Mr. Beyer formed the Living Trust and the Management Trust and (2) he, acting on behalf of the limited partner (i.e., the Living Trust), and Craig Plassmeyer and Bruce Plassmeyer, acting on behalf of the general partner (i.e., the Management Trust), formed EGBLP.

[*70] Madonia & Associates had prepared and that he named the Edward G. Beyer

Irrevocable Trust (Beyer Irrevocable Trust) and thereby formed an irrevocable

trust.  In the Beyer Irrevocable Trust agreement, Mr. Beyer named Craig

Plassmeyer and Bruce Plassmeyer as co-trustees of the Beyer Irrevocable Trust.

The Beyer Irrevocable Trust agreement provided in pertinent part:

**Article One**
**Establishing My Trust**

\*         \*         \*         \*         \*         \*         \*

**Section 1.03         An Irrevocable Trust**

This Trust is irrevocable, and I cannot alter, amend, revoke, or
terminate it in any way.

**Section 1.04         Transfers to the Trust**

I transfer to the Trustee the property listed in Schedule A, attached to
this agreement, to be held on the terms and conditions set forth in this
instrument.  I retain no right, title or interest in the income or
principal of this trust or any other incident of ownership in any trust
property.

By execution of this agreement, my Trustee accepts and agrees to
hold the trust property described on Schedule A.  All property
transferred to my trust after the date of this agreement must be
acceptable to my Trustee.  My Trustee may refuse to accept any
property.  My Trustee shall hold, administer and dispose of all trust

property accepted by my Trustee for the benefit of my beneficiaries in accordance with the terms of this agreement.

\*       \*       \*       \*       \*       \*       \*

## Section 1.06        My Beneficiaries

The beneficiaries of my trust are Craig Plassmeyer, Bruce Plassmeyer and Doris Kaminski.

\*       \*       \*       \*       \*       \*       \*

## Article Six
## Trust Administration

\*       \*       \*       \*       \*       \*       \*

## Section 6.21        Grantor Trust Provisions

While I am alive, I intend that this trust be a grantor trust for federal income tax purposes. I understand that the power granted in this Section will cause the income of my trust to be taxed to me under certain provisions of Section 671 - 677 of the Internal Revenue Code. To carry out this intent, the following provisions shall apply in the administration of my trust.

### (a)    Power of Substitution

During my lifetime, Anthony J. Madonia or a successor Nonadverse Individual, named under subsection (d) of this Section shall have the right to direct that the Trustee transfer any of the trust property to me in exchange for property of equivalent value.

Notwithstanding the foregoing, in the event that the Trust owns an interest in any closely held corporation, partnership or limited liability company, and if the interest carried with it any

voting rights, then the trustee shall have no power to transfer any of the said closely held business interests in exchange for assets of equivalent value.

**(b)     Power to Add Charities as Beneficiaries**

During my lifetime, Anthony J. Madonia or a successor Nonadverse Individual, named under subsection (d) of this Section shall have the power to add to the beneficiaries of this trust by designating any charitable organization described in Section 170 of the Internal Revenue Code, the contributions to which are deductible under Sections 170(c), 642(c), and 2522(a) of the Internal Revenue Code, as an additional beneficiary of the net income of the trust.  Upon designation of an additional charitable beneficiary, my Trustee may, but is not required to, distribute the net income to the additional charitable beneficiary, in such amounts and proportions as my Trustee may determine.  This addition shall be effected by a writing retained with records of the trust, designating the date of the addition of the new beneficiary.

**(c)     Power to Enable Grantor to Borrow**

During my lifetime, Anthony J. Madonia or a successor Non-adverse Individual, named under subsection (d) of this Section shall have the power to grant to me the power to borrow income or principal of my trust without adequate interest or without adequate security, but not both.

The power to borrow income or principal of my trust without adequate interest or without adequate security shall be granted by Anthony J. Madonia or a successor Nonadverse Individual, named under subsection (d) of this Section in writing.  The writing shall specify the terms upon which I may borrow and shall also specify the amount of income or principal that I may borrow upon those terms.

**[*73]**       **(d)     Nonadverse Individual**

The initial "Nonadverse Individual" is Anthony J. Madonia. Anthony J. Madonia or any successor Nonadverse Individual has the right to appoint a successor Nonadverse Individual by an instrument in writing. The appointment of a successor Nonadverse Individual shall take effect upon the death, resignation or incapacity of the appointing Nonadverse Individual. The appointment may be changed or revoked until it takes effect. In the event the Nonadverse Individual fails to make such appointment, then upon the death, resignation or incapacity of the Nonadverse Individual, my Trustee shall have the right to appoint a successor Nonadverse Individual by an instrument in writing. Any individual so appointed shall be a person who is not an adverse party within the meaning of Section 672(a) of the Internal Revenue Code and shall not be related or subordinate to me within the meaning of Section 672(c).

**(e)     Nonfiduciary Capacity**

The powers described in this Section are exercisable solely in a nonfiduciary capacity without approval or consent of any person acting in a fiduciary capacity. No fiduciary duty imposed upon the Nonadverse Anthony J. Madonia or a successor Nonadverse Individual is exonerated from any and all liability to the beneficiaries to this trust that might otherwise accrue as a result of exercising any of the powers granted under this Article in a non-fiduciary capacity. My Trustee is exonerated from any and all liability to the beneficiaries of this trust that might otherwise accrue as a result of my Trustee following the direction of a trust protector exercising any power granted under this Article in a non-fiduciary capacity. My Trustee may, but shall not be required to expend any or all of the trust income and principal to pay premiums on life insurance policies on my life.

**[\*74]**   **(f)   Estate Tax Impact**

The powers described in this Section shall not be exercisable to the extent that the exercise of these powers would reasonably be expected to cause the assets of the trust or any portion thereof to be included in my gross estate for federal estate tax purposes.

**(g)   Waiver**

Any power contained in this Article may be waived or renounced by the holder of said power.  Unless some other date or time is specified, such waiver or renouncement shall be effective when notice if [sic] waiver or renouncement is given in writing to a Trustee of this Trust.

\*         \*         \*         \*         \*         \*         \*

**Schedule A**[22]

Ten Dollars Cash

On April 30, 2005, Craig Plassmeyer and Bruce Plassmeyer, acting on behalf of the general partner of EGBLP, implemented the other estate planning strategy described in Mr. Madonia's March 21, 2005 email when they entered into an agreement with the Capital Trust Co. of Delaware (Capital Trust) that was titled "Capital Trust Investment Account Agreement" (investment agreement).  Pursuant to that agreement, the duration of which was four years, EGBLP was required to deposit into a restricted management account (RMA) assets equal in value to 75

---

[22]Schedule A is attached to the Beyer Irrevocable Trust agreement.

**[*75]** percent of the fair market value of its assets.  Nothing in the investment agreement prohibited the sale of assets that the RMA was to hold pursuant to that agreement.

The investment agreement provided in pertinent part:

WHEREAS, the Depositor [EGBLP] intends to deposit certain property, such as cash, stocks, bonds, securities and other property, in an Account [RMA] with the Agent * * * [Capital Trust], which property is listed on Exhibit A, attached hereto and made a part of this Agreement;

WHEREAS, the assets in the Account (which include the income, dividends and interest therefrom and the reinvestment thereof) are to be held for the Depositor, and are to be managed, invested and distributed in accordance with the terms of this Agreement by the Agent;

WHEREAS, the Depositor desires to obtain long-term investment results on the Account's assets, and the Depositor and the Agent are entering into this Agreement in order to relieve the Agent of the pressure to produce superior short-term investment results possibly at the expense of greater long-term investment results.

\*          \*          \*          \*          \*          \*          \*

1.     **Investment Adviser.**  The Investment Adviser may be a person or entity nominated by the Depositor pursuant to an Investment Adviser Nomination (in substantially the same form as the sample attached hereto) and hired by the Agent.  If an Investment Adviser has not been nominated by the Depositor and the Agent has not engaged an Investment Adviser for investment review and management pursuant to a written agreement, the Agent may provide investment review and management of the Account, taking such action as the Agent, in its discretion, deems best with respect to the investment and

**[*76]** reinvestment of the property held therein as though the Agent were the owner of such property.  The Agent's authority extends, though it is not limited to, the sale and purchase of securities, the sale or exercise of warrants, subscription right and other rights of similar nature, the voting of all proxies issued and participation in corporate reorganizations.  It is understood that the property in the Account will be invested in accordance with any statement of investment objectives by the Depositor on Exhibit B, attached hereto and made a part of this Agreement.

If the Depositor nominates an Investment Adviser in writing delivered to the Agent, the Agent may engage and use the investment adviser selected by the Depositor for any period of time including the entire term of this Agreement, subject to removal and replacement by the Independent Adviser as hereinafter provided in Section 2 below.

\*        \*        \*        \*        \*        \*        \*

3.      **Income.**  With the exception of expenses associated with the Account, which shall be paid from the income earned by the Account, the dividends, interest and other income earned on property held in the Account shall be distributed out to the Depositor in accordance with this Agreement.

4.      **Distribution of Account Principal During Term of Agreement.**  Until the Termination Date (as hereinafter defined), no distributions of Account principal shall be made from the Account by the Agent to the Depositor or to any other person or entity for any purpose.

\*        \*        \*        \*        \*        \*        \*

6.      **Transfers.**  The Depositor may not Transfer all or any part of the Account, except as provided in this Section.  Any purported Transfer of an Account not in conformance with this Section [6] shall be null, void and of no effect.  The recipient of a validly transferred

**[*77]** account shall automatically be bound by the provisions of this Agreement as applicable to such Account.

As used herein, Transfer means, as a noun, a transaction by which the Depositor assigns all or any part of the Account or any interest therein to another person or entity, and includes a sale, assignment, gift, bequest, pledge, encumbrance, hypothecation, mortgage, exchange, distribution from a trust, or any other disposition. As used herein, Transfer means, as a verb, to voluntarily or involuntarily enter into a transaction described above as a Transfer.

The Depositor may Transfer all or any part of the Account after requesting and receiving the written consent of the Agent to make such Transfer, provided that the transferee is a "Permitted Transferee" (as hereinafter defined) and such Permitted Transferee executes a counterpart of this Agreement agreeing to all the terms of this Agreement and any other document reasonably requested by the Agent in furtherance of the purpose of this Agreement. The Agent's consent to a Transfer will not be unreasonably withheld.

A "Permitted Transferee" means any one or more of the following: (a) his ancestors, and his descendants; (b) one or more organizations described in Sections 170(c), 2055(a), and 2522(a) of the Code; (c) the decedent's estate or guardianship estate of any of the persons listed in (a), and (d) a trust the terms of which provide that the Account is held, at the time of the Transfer of the Account to the trust, exclusively for the benefit of one or more of the persons listed in (a); provided, however, for purposes of (c) and (d) above, the remaindermen of a trust shall not be considered in determining whether a trust is exclusively for the benefit of one or more of the persons listed in (a).

Any purported Transfer which is to a person or organization other than a Permitted Transferee or that is not accompanied by an executed counterpart of this Agreement shall be null, void and of no effect. Upon the valid Transfer of an Account, the recipient of such Account

**[*78]** shall be considered the Depositor of such Account for purposes of this Agreement.

If the Depositor Transfers only a portion of the Account to another person or entity, the Agent shall divide the Account into two Accounts: one of which shall consist of the portion of the Account intended to be Transferred to such other person or entity (the New Account), and the other of which shall consist of the balance of the Account (the Original Account). The Agent shall have sole discretion to determine which assets held by the Original Account will be allocated to the New Account. This Agreement shall apply separately to each New Account created hereunder.

If a valid Transfer results in an Account having a value less than $250,000, the Agent may, in its discretion, terminate such Account and distribute the assets held in such Account as provided under Section 8 of this Agreement.

\*          \*          \*          \*          \*          \*          \*

8.     **Terms of Agreement.**  The agency hereby created shall terminate on the fourth (4th) anniversary of the date hereof (Termination Date); provided, however that the Termination Date for an Account may be changed to a later date (but not an earlier date) at any time upon written consent of both the Depositor of such Account and the Agent. \* \* \*

Upon the Termination Date of an Account, the Agent shall pay over and deliver the assets held in such account to the Depositor (or to the Depositor's legal representatives), or upon the Depositor's orders make such other disposition of the assets held in the Account as the Depositor may direct.

\*          \*          \*          \*          \*          \*          \*

10.     **Fees.**  The agent shall receive reasonable compensation for all services rendered by the Agent in performance of its duties in

[*79] accordance with the Agent's regularly adopted schedule of charges in effect and applicable at the time of the performance of such services. The Depositor acknowledges that a current schedule of the Agent's charges has been given to the Depositor and further acknowledges that the amount of the Agent's compensation shall be charged to the Account at regular intervals during each accounting year. The schedule is as follows:

Fifty-five (55) basis points of the balance of the account.

Exhibit B attached to the investment agreement, which was titled "RESTRICTED MANAGEMENT ACCOUNT AGREEMENT STATEMENT OF INVESTMENT OBJECTIVES", provided: "The partnership portfolio currently has a significant built in capital gain. Care should be taken in the management of this portfolio to avoid creating capital gains tax to the partners."

On June 30, 2005, Craig Plassmeyer, acting on behalf of the general partner of EGBLP, directed that 5,363 shares of Putnam Tax-Free High Yield Fund and the following shares of stock (RMA assets) be transferred from EGBLP's Banc One account to an account at Chase in the name of the RMA (RMA Chase account):

[*80]

| Stock | Number of Shares |
|---|---|
| Transocean Ltd. | 870 |
| Abbott Laboratories | 600,000 |
| Altria Group, Inc. | 1,800 |
| Arbitron, Inc. | 600 |
| Ceridian Corp. | 3,000 |
| Chevron Corp. | 693 |
| ConocoPhillips Co. | 788 |
| Constellation Energy Group | 1,350 |
| Edison Int'l | 1,500 |
| Hospira, Inc. | 60,000 |
| IBM | 3,000 |
| Mirant Corp. | 591 |
| Nicor, Inc. | 789 |
| PPL Corp. | 450 |
| Pepco Holdings, Inc. | 900 |
| Schlumberger Ltd. | 4,500 |
| Southern Co. | 1,488 |

On July 11, 2005, the directive of the general partner of EGBLP was implemented and the RMA assets were transferred from the EGBLP Banc One

[*81] account to the RMA Chase account.  The remaining assets in the EGBLP

Banc One account were transferred to another account at Chase in the name of

EGBLP (EGBLP Chase account).

On December 30, 2005, after the general partner of EGBLP entered into the

investment agreement, the Living Trust and the Beyer Irrevocable Trust

implemented the second step of one of the estate planning strategies described in

Mr. Madonia's March 21, 2005 email.  On that date, they entered into an

agreement titled "PURCHASE and SALE AGREEMENT [of] LIMITED

PARTNERSHIP OWNERSHIP INTERESTS" (Living Trust transfer agreement).

Pursuant to that agreement, the Living Trust was to, and did on December 30,

2005, transfer to the Beyer Irrevocable Trust the 99-percent limited partnership

interest in exchange for that trust's promissory note in the face amount of

$20,866,725 (Beyer Irrevocable Trust promissory note).[23]  (We shall sometimes

refer to the Living Trust's transfer of the 99-percent limited partnership interest to

the Beyer Irrevocable Trust as the Living Trust 2005 transfer.)  The principal

amount of the Beyer Irrevocable Trust promissory note was payable to the Living

---

[23]The Living Trust and the Beyer Irrevocable Trust agreed to the Living
Trust's transfer of the 99-percent limited partnership interest in exchange for the
Beyer Irrevocable Trust promissory note in the face amount of $20,866,725 on the
basis of a valuation of that interest as of November 30, 2005, that Iron Horse
Valuation Group performed.

**[\*82]** Trust on December 30, 2005.[24]  The Beyer Irrevocable Trust promissory note bore interest at a rate of 4.45 percent, compounded annually.[25]

Pursuant to the Living Trust transfer agreement, the Beyer Irrevocable Trust promissory note was secured by a security agreement (Beyer Irrevocable Trust security agreement) that was attached as Exhibit B to that agreement.  The Beyer Irrevocable Trust security agreement provided in pertinent part:

> In order to secure the payment of the principal of and interest at a rate of 4.45% on, and all other sums payable under, the Twenty Million Eight Hundred Sixty-Six Thousand Seventy Hundred Twenty Five 00/100 ($20,866,725) Dollars, principal amount promissory note (the "Debtor's Note") of the Debtor, payable to the order of the Secured Party in accordance with the terms of the Debtor Note, the Debtor hereby grants to the Secured Party a security interest in all accounts and accounts receivable, all machinery, equipment, office furniture and office equipment of the Debtor, and all other tangible personal property, whether now owned or hereafter acquired, including

---

[24]The limited partner of EGBLP (i.e., the Living Trust) and the general partner of EGBLP (i.e., the Management Trust) consented to the Living Trust's transfer of the 99-percent limited partnership interest to the Beyer Irrevocable Trust.

[25]As detailed in the Living Trust transfer agreement, the Beyer Irrevocable Trust was required to make certain minimum payments of interest on the Beyer Irrevocable Trust promissory note at interest rates and on certain dates specified in that agreement, although it did have certain options regarding those minimum payments.

[*83] without limitation, all accessions to and substitutions for the same (all of said property being hereinafter called the "Collateral").

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

As used in this Agreement, the term "accounts receivable" includes all rights to payment, all sums of money or other proceeds due or becoming due thereon, all instruments pertaining thereto and all guaranties and security therefore.

When the Beyer Irrevocable Trust issued the Beyer Irrevocable Trust promissory note to the Living trust on December 30, 2005, the former had only $10 of assets.

After the Living Trust 2005 transfer, Mr. Beyer knew that the Living Trust was no longer a partner in EGBLP and that consequently the Living Trust was no longer entitled to any distributions that EGBLP decided to make to its partners pursuant to the EGBLP agreement. Mr. Beyer also knew after the Living Trust 2005 transfer that the Living Trust's total assets consisted of the Beyer Irrevocable Trust promissory note in the face amount of $20,866,725 and the Living Trust Banc One account, which around one month after the Living Trust 2005 transfer contained approximately $600,000.

After the Living Trust 2005 transfer, Mr. Beyer did not contribute additional assets to the Living Trust. Nor did he amend Mr. Beyer's will or the Living Trust

[*84] agreement to change the Living Trust's obligation to pay any death taxes that would be due after he died.

On April 15, 2006, Mr. Beyer signed a check drawn on the Living Trust Banc One account in the amount of $659,660 ($659,660 check) that was payable to the Internal Revenue Service (IRS). The memorandum line on that check stated: "Gift Tax". On April 17, 2006, Mr. Beyer filed Form 709, United States Gift (and Generation-Skipping Transfer) Tax Return (Form 709), for his taxable year 2005 (2005 gift tax return), in which he showed total gift tax of $659,660. On the same date, when the Living Trust was not a partner in EGBLP and consequently was not entitled to receive any distributions that EGBLP decided to make to its partners pursuant to the EGBLP agreement, $659,660 was transferred from EGBLP's Chase account to the Living Trust Banc One account. Mr. Beyer used the $659,660 check to pay the gift tax due shown in his 2005 gift tax return.

In an email dated April 26, 2006, from Craig Plassmeyer to Monique Tayyab (Ms. Tayyab), an attorney with Madonia & Associates, Craig Plassmeyer stated in pertinent part: "[A]ll these trusts are getting confusing. Explain to me how to record this interest payment. Which specific accounts * * * [should] show the movement of cash[?]"

**[\*85]** In an email dated April 26, 2006, from Ms. Tayyab to Craig Plassmeyer,

Ms. Tayyab stated in pertinent part:

> The Limited Partnership is now owned by the [Beyer] Irrevocable
> Trust, instead of the Living Trust.  Therefore, the interest payment to
> the Living Trust for the purchase of the Limited Partnership Units
> should come from the Limited Partnership Account.
>
> You will show a transfer from the Limited Partnership Account * * *
> to the Living Trust Account.

After the Living Trust 2005 transfer on December 30, 2005, and while the

Beyer Irrevocable Trust owned a 99-percent interest in EGBLP and consequently

was entitled to receive distributions from EGBLP that it decided to make to its

partners pursuant to the EGBLP agreement, EGBLP made certain transfers from

the EGBLP Chase account to the Living Trust Banc One account on behalf of the

Beyer Irrevocable Trust.  The respective amounts of those transfers and the

respective dates on which EGBLP made them are:

[*86]

| Date | Amount |
|---|---|
| 6/12/2006 | [1]$116,071.16 |
| 9/8/2006 | 116,071.16 |
| 12/14/2006 | 116,071.16 |
| 2/26/2007 | 116,071.16 |
| 5/18/2007 | 116,071.16 |
| 10/9/2007 | 116,071.16 |
| 12/7/2007 | 116,071.16 |
| 2/21/2008 | 116,071.16 |

[1]In an email dated September 29, 2007, from Margareth Smid (Ms. Smid) to Craig Plassmeyer, Ms. Smid stated that on June 12, 2006, a transfer of $117,375.34, instead of $116,071.16, had been made from the EGBLP Chase account to the Living Trust Banc One account. In the same email, Ms. Smid stated that to correct that error Chase transferred the difference of $1,304.18 from the Living Trust Banc One account to the EGBLP Chase account.

Each of the transfers of $116,071.16 (listed above) was an interest payment on the Beyer Irrevocable Trust promissory note that EGBLP made to the Living Trust on behalf of its limited partner, the Beyer Irrevocable Trust.

During January and February 2008, after Mr. Beyer's death on May 19, 2007, EGBLP sold 1,789 shares of Putnam Tax-Free High Yield Fund and the following shares of stock:

[*87]

| Stock | Number of Shares |
|---|---|
| Transocean Ltd. | 203 |
| Abbott Laboratories | 100,000 |
| Altria Group, Inc. | 600 |
| Arbitron, Inc. | 200 |
| Chevron Corp. | 231 |
| ConocoPhillips Co. | 262 |
| Constellation Energy Group | 450 |
| Edison Int'l | 500 |
| IBM | 1,000 |
| Kraft Foods Group, Inc. | 415 |
| Mirant Corp. | 17 |
| Nicor, Inc. | 263 |
| PPL Corp. | 300 |
| Pepco Holdings, Inc. | 300 |
| Schlumberger Ltd. | 3,000 |
| Hospira, Inc. | 20,000 |

On February 12, 2008, EGBLP transferred $250,000 from the EGBLP

Chase account to the Living Trust Banc One account. On the same date, Craig

Plassmeyer, as executor of decedent's estate, signed two checks, each for $75,000,

[*88] that were drawn on the EGBLP Chase account and that were payable to Craig Plassmeyer and Bruce Plassmeyer, respectively. Each of those checks stated on the memorandum line: "Administration Fee".

As discussed in more detail below, around February 14, 2008, Craig Plassmeyer, as executor of decedent's estate, filed Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return (Form 706), (estate tax return). That return showed net estate tax of $9,345,334. On February 18, 2008, Craig Plassmeyer signed a check drawn on the EGBLP Chase account in the amount of $9,345,334 that was payable to the IRS ($9,345,334 check). The memorandum line of that check stated: "IRS 706". Decedent's estate used the $9,345,334 check to pay the estate tax due shown in the estate tax return. On February 19, 2008, at a time the Living Trust was not a partner in EGBLP and consequently was not entitled to receive any distributions that EGBLP decided to make to its partners pursuant to the EGBLP agreement, $9,945,000 was transferred from the EGBLP Chase account to the Living Trust Banc One account.

The Capital Trust investment agreement terminated after the four-year term of that agreement expired. As a result, in August 2009, assets held in the RMA Chase account were transferred from that account to the EGBLP Chase account.

**[*89]** <u>Section 529 Accounts and Certain Other Gifts</u>

On December 28, 2001, Mr. Beyer established a so-called section 529 account[26] for each of his following relatives: Wendy Aldrich, Mildred Beyer, Molly Buck, Joan Buck-Plassmeyer, Rebecca Buck, Craig Plassmeyer, Bruce Plassmeyer, Mark Plassmeyer, Ruth Plassmeyer, and Lucille Wilkinson. (We shall refer collectively to the section 529 accounts that Mr. Beyer established in 2001 as the 2001 section 529 accounts.) On the same date, Mr. Beyer contributed $10,000 to each of the 2001 section 529 accounts. On January 3, 2002, Mr. Beyer contributed an additional $55,000 to each of the 2001 section 529 accounts.

In a facsimile dated December 18, 2004 (Craig Plassmeyer's December 18, 2004 facsimile) from Craig Plassmeyer to Mr. Holup, Craig Plassmeyer instructed Mr. Holup to establish additional section 529 accounts for Mr. Beyer. In Craig Plassmeyer's December 18, 2004 facsimile, Craig Plassmeyer stated:

> 529 PLANS TO BE SET-UP [sic] WITH FUNDING OF EACH FOR $11,000 IN DECEMBER 2004. THEN, 5 YEAR FORWARD GIFT-ING OF $55,000 EACH IN JANUARY 2005.
>
> TOTAL IN DECEMBER = $88,000; TOTAL IN JANUARY = $440,000 FOR A GRAND TOTAL OF $528,000. ALL CASH

---

[26]A section 529 account is an account that qualifies as a "qualified tuition plan" under sec. 529.

**[*90]** NEEDS TO COME OUT OF THE LIVING TRUST ACCOUNT
**NOT THE FAMILY LIMITED PARTNERSHIP**.

On December 21, 2004, Mr. Beyer established a section 529 account for each of his following relatives: Sean Fantetti, Robert Fantetti, Scott Kaminski, Richard Kaminski, Jean Fantetti, Heather Fantetti, Tara Fantetti, and Doris Kaminski. (We shall refer collectively to the section 529 accounts that Mr. Beyer established in 2004 as the 2004 section 529 accounts.) On the same date, Mr. Beyer contributed $11,000 to each of the 2004 section 529 accounts. On January 6, 2005, Mr. Beyer contributed an additional $55,000 to each of the 2004 section 529 accounts. Decedent died within five years after he had made the transfers to the 2004 section 529 accounts.

On May 20, 2005, Mr. Beyer made a gift of $1,250,000 to each of Craig Plassmeyer and Bruce Plassmeyer. Mr. Beyer used certain assets held in the Living Trust Banc One account to fund each of those gifts.

EGBLP's Partnership Returns

EGBLP did not file Form 1065, U.S. Return of Partnership Income (Form 1065), for its taxable year 2003. That was because EGBLP had not yet been funded.

[*91]  At times not established by the record, EGBLP filed respective Forms 1065 for taxable years 2004 (2004 EGBLP partnership return), 2005 (2005 EGBLP partnership return), 2006 (2006 EGBLP partnership return), 2007 (2007 EGBLP partnership return), and 2008 (2008 EGBLP partnership return).  (We shall sometimes refer collectively to the 2004 EGBLP partnership return, the 2005 EGBLP partnership return, the 2006 EGBLP partnership return, the 2007 EGBLP partnership return, and the 2008 EGBLP partnership return as EGBLP's original partnership returns.)

EGBLP attached to the 2004 EGBLP partnership return two Schedules K-1, Partner's Share of Income, Deductions, Credits, etc. (Schedule K-1).  In one of those schedules, EGBLP showed that the Living Trust had a 99-percent partnership ownership interest at the end of taxable year 2004 but did not show the Living Trust's partnership ownership interest at the beginning of that year.  In the other Schedule K-1, EGBLP showed that the Management Trust had a one-percent partnership ownership interest at the end of taxable year 2004 but did not show the Living Trust's partnership ownership interest at the beginning of that year.

In the 2004 EGBLP partnership return, EGBLP showed the following with respect to the capital accounts of its partners:  (1) with respect to the Living Trust, a beginning capital account balance of zero, capital contributions of $40,956,813,

[*92] a current-year increase of $430,842, and an ending capital account balance of $41,387,655; and (2) with respect to the Management Trust, a beginning capital account balance of zero, capital contributions of $413,705, a current-year increase of $4,352, and an ending capital account balance of $418,057.

EGBLP attached to the 2005 EGBLP partnership return two Schedules K-1. In one of those schedules, EGBLP showed that the Living Trust had a 99-percent partnership ownership interest at the end of taxable year 2005 and a 24.75-percent partnership ownership interest at the beginning of that year. In the other Schedule K-1, EGBLP showed that the Management Trust had a one-percent partnership ownership interest at the end of taxable year 2005 and a one-percent partnership ownership interest at the beginning of that year. The 2005 EGBLP partnership return did not include Schedule K-1 for the Beyer Irrevocable Trust, which acquired the 99-percent limited partnership interest during EGBLP's taxable year 2005.

In the 2005 EGBLP partnership return, EGBLP showed the following with respect to the capital accounts of its partners: (1) with respect to the Living Trust, a beginning capital account balance of $41,387,655, a current-year increase of $464,313, withdrawals and distributions of $32,993,796, and an ending capital account balance of $8,858,172; and (2) with respect to the Management Trust, a

[*93] beginning capital account balance of $418,057, a current-year increase of $8,513, withdrawals and distributions of $214,000, and an ending capital account balance of $212,570.

EGBLP attached to the 2006 EGBLP partnership return three Schedules K-1. In one of those schedules, EGBLP showed that the Living Trust had a 24.75-percent partnership ownership interest at the end of taxable year 2006 and a 24.75-percent partnership ownership interest at the beginning of that year. In another Schedule K-1, EGBLP showed that the Management Trust had a one-percent partnership ownership interest at the end of taxable year 2006 and a one-percent partnership ownership interest at the beginning of that year. In the third Schedule K-1, EGBLP showed that the Beyer Irrevocable Trust had a 74.25-percent partnership ownership interest at the end of taxable year 2006 and a 74.25-percent partnership ownership interest at the beginning of that year.

In the 2006 EGBLP partnership return, EGBLP showed the following with respect to the capital accounts of its partners: (1) with respect to the Living Trust, a beginning capital account balance of $8,608,928, a current-year increase of $198,006, and an ending capital account balance of $8,806,934; (2) with respect to the Management Trust, a beginning capital account balance of $207,392, a current-year increase of $8,001, and an ending capital account balance of

[*94] $215,393; and (3) with respect to the Beyer Irrevocable Trust, a beginning capital account balance of $33,502,640, a current-year increase of $594,022, and an ending capital account balance of $34,096,662.

EGBLP attached to the 2007 EGBLP partnership return four Schedules K-1. In one of those schedules, EGBLP showed that the Management Trust had a one-percent partnership ownership interest at the end of taxable year 2007 and a one-percent partnership ownership interest at the beginning of that year. In another Schedule K-1, EGBLP showed that the Beyer Irrevocable Trust had a 99-percent partnership ownership interest at the end of taxable year 2007 and a 99-percent partnership ownership interest at the beginning of that year. In another Schedule K-1, EGBLP did not show that the Management Trust had a partnership ownership interest at the end of taxable year 2007 and did not show the Management Trust's partnership ownership interest at the beginning of that year. In the fourth Schedule K-1, EGBLP did not show the Beyer Irrevocable Trust's partnership ownership interest at the end of taxable year 2007 and did not show the Beyer Irrevocable Trust's partnership ownership interest at the beginning of that year.

The 2007 EGBLP partnership return contained two inconsistent Schedules K-1 for each of the Management Trust and the Beyer Irrevocable Trust. With respect to the Management Trust, one of those schedules showed a beginning

**[*95]** capital account balance of $214,526, a current-year decrease of $214,526, and an ending capital account balance of zero. The other Schedule K-1 showed with respect to the Management Trust a beginning capital account balance of zero, a current-year increase of $224,177, and an ending capital account balance of $224,177. With respect to the Beyer Irrevocable Trust, one of the Schedules K-1 showed a beginning capital account balance of $42,904,463, a current-year decrease of $42,904,463, and an ending capital account balance of zero. The other Schedule K-1 showed with respect to the Beyer Irrevocable Trust a beginning capital account balance of zero, a current-year increase of $43,859,836, and an ending capital account balance of $43,859,836.

EGBLP attached to the 2008 EGBLP partnership return two Schedules K-1. In one of those schedules, EGBLP showed that the Management Trust had a one-percent partnership ownership interest at the end of taxable year 2008 and a one-percent partnership ownership interest at the beginning of that year. In the other Schedule K-1, EGBLP showed that the Beyer Irrevocable Trust had a 99-percent partnership ownership interest at the end of taxable year 2008 and a 99-percent partnership ownership interest at the beginning of that year.

In the 2008 EGBLP partnership return, EGBLP showed the following with respect to the capital accounts of its partners: (1) with respect to the Management

[*96] Trust, a beginning capital account balance of $7,852,265, a current-year decrease of $26,018, and an ending capital account balance of $7,826,247; and (2) with respect to the Beyer Irrevocable Trust, a beginning capital account balance of $43,859,836, a current-year decrease of $2,575,934, and an ending capital account balance of $41,283,902.

In the 2008 EGBLP partnership return, EGBLP showed long-term capital gains for taxable year 2008 from the sale of securities during that taxable year. In that return, EGBLP showed that the securities sold during taxable year 2008 had been acquired by EGBLP on November 19, 2007, and had a basis equal to the value of the securities on that date.

In 2008, EGBLP filed amended Forms 1065 for its taxable years 2005 (2005 EGBLP amended partnership return) and 2006 (2006 EGBLP amended partnership return).[27] (We shall sometimes refer collectively to the 2005 EGBLP amended partnership return and 2006 EGBLP amended partnership return as EGBLP's amended partnership returns filed in 2008.)

---

[27]The record does not establish the date(s) on which EGBLP filed the 2005 EGBLP amended partnership return and the 2006 EGBLP amended partnership return. The date appearing in each of those returns next to the respective signatures of the general partner and the return preparer is February 5, 2008.

[*97] EGBLP attached to the 2005 EGBLP amended partnership return three

Schedules K-1. In one of those schedules, EGBLP did not show the Living

Trust's ownership interest at the end of taxable year 2005 but showed that the

Living Trust had a 99-percent partnership ownership interest at the beginning of

that year. In another Schedule K-1, EGBLP showed that the Management Trust

had a one-percent partnership ownership interest at the end of taxable year 2005

and a one-percent partnership ownership interest at the beginning of that year. In

the third Schedule K-1, EGBLP showed that the Beyer Irrevocable Trust had a 99-

percent partnership ownership interest at the end of taxable year 2005 but did not

show the Beyer Irrevocable Trust's partnership ownership interest at the beginning

of that year.

In the 2005 EGBLP amended partnership return, EGBLP showed the

following with respect to the capital accounts of its partners: (1) with respect to

the Living Trust, a beginning capital account balance of $41,387,655, capital

contributions of ($41,768,415),[28] a current-year increase of $380,760, and an

ending capital account balance of zero; (2) with respect to the Management Trust,

a beginning capital account balance of $418,057, capital contributions of

_____

[28]The record does not establish why the 2005 EGBLP amended partnership
return showed that the Living Trust had negative capital contributions.

**[\*98]** ($4,793),[29] a current-year increase of $7,261, withdrawals and distributions of $214,000, and an ending capital account balance of $206,525; and (3) with respect to the Beyer Irrevocable Trust, a beginning capital account balance of zero, capital contributions of $41,773,208, a current-year increase of $339,227, and an ending capital account balance of $42,112,435.

EGBLP attached to the 2006 EGBLP amended partnership return two Schedules K-1. In one of those schedules, EGBLP showed that the Management Trust had a one-percent partnership ownership interest at the end of taxable year 2006 and a one-percent partnership ownership interest at the beginning of that year. In the other Schedule K-1, EGBLP showed that the Beyer Irrevocable Trust had a 99-percent partnership ownership interest at the end of taxable year 2006 and a 99-percent partnership ownership interest at the beginning of that year.

In the 2006 EGBLP amended partnership return, EGBLP showed the following with respect to the capital accounts of its partners: (1) with respect to the Management Trust, a beginning capital account balance of $206,525, a current-year increase of $8,001, and an ending capital account balance of $214,526; and (2) with respect to the Beyer Irrevocable Trust, a beginning capital

---

[29]The record does not establish why the 2005 EGBLP amended partnership tax return showed that the Management Trust had negative capital contributions.

[*99] account balance of $42,112,435 a current-year increase of $792,028, and an ending capital account balance of $42,904,463.

In 2009, EGBLP filed amended Forms 1065 for its taxable years 2004 (2004 EGBLP amended partnership return), 2005 (2005 EGBLP second amended partnership return), 2006 (2006 EGBLP second amended partnership return), 2007 (2007 EGBLP amended partnership return), and 2008 (2008 EGBLP amended partnership return).[30] (We shall sometimes refer collectively to the 2004 EGBLP amended partnership return, 2005 EGBLP second amended partnership return, the 2006 EGBLP second amended partnership return, 2007 EGBLP amended partnership return, and 2008 EGBLP amended partnership return as EGBLP's amended partnership returns filed in 2009).

Attached to each of EGBLP's amended partnership returns filed in 2009 was a document titled "EXPLANATION STATEMENT". That statement indicated as follows:

> The Capital Accounts in the above-referenced return of partnership
> income reflected a percentage ownership of one percent (1%) by the

---

[30]The record does not establish the date on which EGBLP filed the 2004 EGBLP amended  partnership return, 2005 EGBLP second amended partnership return, 2006 EGBLP second amended partnership return, 2007 EGBLP amended partnership return, or 2008 EGBLP amended partnership return. The date appearing in each of those returns next to the respective signatures of the general partner and the return preparer is December 9, 2009.

[*100] General Partner and ninety-nine percent (99%) by the Limited Partners. Non-pro rata distributions in each of the partnership's years impacted ownership percentage over time, though corresponding adjustments were not reflected in the Partnership's Forms 1065.  In November of 2009, a catch-up proportionate distribution in the amount of $31,920.28 was made to the 1% General Partner, bringing the ownership interests reflected in the Partners' capital accounts back to 99% and 1%.  Given the de minimus [sic] nature of the proportionate cumulative distribution, in conjunction with the magnitude of accounting necessary to adjust ownership interests at each distribution date, to bring them back to a 99/1 ratio on November 5, 2009, the General Partner of the Partnership has, in this amended return and in all others, maintained the ownership interests at 99% and 1%.

EGBLP attached to the 2004 EGBLP amended partnership return two Schedules K-1.  In one of those schedules, EGBLP showed that the Living Trust had a 99-percent partnership ownership interest at the end of taxable year 2004 but did not show the Living Trust's partnership ownership percentage at the beginning of that year.  In the other Schedule K-1, EGBLP showed that the Management Trust had a one-percent partnership ownership interest at the end of taxable year 2004 but did not show the Management Trust's partnership ownership interest at the beginning of that year.

In the 2004 EGBLP amended partnership return, EGBLP showed the following with respect to the capital accounts of its partners:  (1) with respect to the Living Trust, a beginning capital account balance of zero, capital contributions

**[*101]** of $36,261,552, a current-year increase of $430,842, withdrawals or distributions of $218,340, and an ending capital account balance of $36,474,054 and (2) with respect to the Management Trust, a beginning capital account balance of zero, capital contributions of $366,278 a current-year increase of $4,352, and an ending capital account balance of $370,630.

EGBLP attached to the 2005 EGBLP second amended partnership return three Schedules K-1. In one of those schedules, EGBLP did not show the Living Trust's partnership ownership interest at the end of taxable year 2005 but showed that the Living Trust had a 99-percent partnership ownership interest at the beginning of that year. In another Schedule K-1, EGBLP showed that the Management Trust had a one-percent partnership ownership interest at the end of taxable year 2005 and a one-percent partnership ownership interest at the beginning of that year. In the third Schedule K-1, EGBLP showed that the Beyer Irrevocable Trust had a 99-percent partnership ownership interest at the end of taxable year 2005 but did not show the Beyer Irrevocable Trust's partnership ownership interest at the beginning of that year.

In the 2005 EGBLP second amended partnership return, EGBLP showed the following with respect to the capital accounts of its partners: (1) with respect to the Living Trust, a beginning capital account balance of $36,474,054, a current-

**[*102]** year increase of $713,620, withdrawals or distributions of $37,187,674, and an ending capital account balance of zero; (2) with respect to the Management Trust, a beginning capital account balance of $370,630, a current-year increase of $7,242, and an ending capital account balance of $377,872; and (3) with respect to the Beyer Irrevocable Trust, a beginning capital account balance of zero, a current-year increase of $3,909, withdrawals or distributions of $36,773,674, and an ending capital account balance of $36,777,583 (not a negative ending capital account balance).

EGBLP attached to the 2006 EGBLP second amended partnership return two Schedules K-1. In one of those schedules, EGBLP showed that the Management Trust had a one-percent partnership ownership interest at the end of taxable year 2006 and a one-percent partnership ownership interest at the beginning of that year. In the other Schedule K-1, EGBLP showed that the Beyer Irrevocable Trust had a 99-percent partnership ownership interest at the end of taxable year 2006 and a 99-percent partnership ownership interest at the beginning of that year.

In the 2006 EGBLP second amended partnership return, EGBLP showed the following with respect to the capital accounts of its partners: (1) with respect to the Management Trust, a beginning capital account balance of $377,872, a current

[*103] year increase of $8,003, and an ending capital account balance of $385,875; and (2) with respect to the Beyer Irrevocable Trust, a beginning capital account balance of $36,777,583 (not a negative beginning capital account balance), a current-year increase of $792,314, withdrawals or distributions of $1,007,873, and an ending capital account balance of $36,562,024 (not a negative ending capital account balance).

EGBLP attached to the 2007 EGBLP amended partnership return two Schedules K-1. In one of those schedules, EGBLP showed that the Management Trust had a one-percent partnership ownership interest at the end of taxable year 2007 and a one-percent partnership ownership interest at the beginning of that year. In the other Schedule K-1, EGBLP showed that the Beyer Irrevocable Trust had a 99-percent partnership ownership interest at the end of taxable year 2007 and a 99-percent partnership ownership interest at the beginning of that year.

In the 2007 EGBLP amended partnership return, EGBLP showed the following with respect to the capital accounts of its partners: (1) with respect to the Management Trust, a beginning capital account balance of $385,875, a current-year increase of $219,679, and an ending capital account balance of $605,554 and (2) with respect to the Beyer Irrevocable Trust, a beginning capital account balance of $36,562,024 (not a negative beginning capital account

[*104] balance), a current-year increase of $741,980, withdrawals or distributions of $464,285, and an ending capital account balance of $36,839,719 (not a negative ending capital account balance).

EGBLP attached to the 2008 EGBLP amended partnership return two Schedules K-1. In one of those schedules, EGBLP showed that the Management Trust had a one-percent partnership ownership interest at the end of taxable year 2008 and a one-percent partnership ownership interest at the beginning of that year. In the other Schedule K-1, EGBLP showed that the Beyer Irrevocable Trust had a 99-percent partnership ownership interest at the end of taxable year 2008 and a 99-percent partnership ownership interest at the beginning of that year.

In the 2008 EGBLP amended partnership return, EGBLP showed the following with respect to the capital accounts of its partners: (1) with respect to the Management Trust, a beginning capital account balance of $605,554, a current-year increase of $110,591, and an ending capital account balance of $716,145, and (2) with respect to the Beyer Irrevocable Trust, a beginning capital account balance of $37,931,678 (not a negative beginning capital account balance), a current-year increase of $10,948,397, withdrawals or distributions of $486,071, and an ending capital account balance of $48,394,004 (not a negative ending capital account balance).

**[*105]**      In the 2008 EGBLP amended partnership return, EGBLP showed long-term capital gains for taxable year 2008 from the sale of securities during that taxable year.  In that return, EGBLP showed that the securities sold during that taxable year had been acquired by EGBLP on November 19, 2007, and had a basis that was equal to the value of those securities on the alternate valuation date that Mr. Beyer's estate had elected.

All Forms 1065, original and amended, that EGBLP filed were signed by Mr. Madonia as preparer and by Craig Plassmeyer, acting on behalf of the general partner of EGBLP.

At a time not established by the record, Madonia & Associates prepared, or maintained, the following documents with respect to EGBLP:  (1) purported cash summaries for each of the taxable years from 2004 through 2008; (2) purported working trial balances for each of the taxable years from 2004 through 2008; and (3) purported adjusted journal entries for each of the taxable years 2006 and 2008.

Decedent's Income Tax Returns

At times not established by the record, Mr. Beyer filed Forms 1040, U.S. Individual Income Tax Return (income tax return), for his taxable years 2003, 2004, 2005, 2006 (2006 income tax return), and 2007 (2007 income tax return).

[*106]     At all relevant times, including after Mr. Beyer, acting on behalf of the limited partner, and Craig Plassmeyer and Bruce Plassmeyer, acting on behalf of the general partner, formed EGBLP, Mr. Beyer continued to report in his income tax returns all of the income from all assets that he had transferred from the 1999 Trust Banc One account to the EGBLP Banc One account.

Mr. Beyer did not report any interest income with respect to the Beyer Irrevocable Trust promissory note in his 2006 income tax return or his 2007 income tax return.

Mr. Beyer's Gift Tax Returns

Mr. Beyer did not file Form 709 for his taxable year 2002 and did not pay any gift tax with respect to that taxable year.

Line B of Schedule A, Computation of Taxable Gifts (Schedule A), attached to Form 709 for gifts made during calendar year 2002 contained a box and stated: "Check here if you elect under section 529(c)(2)(B) to treat any transfers made this year to a qualified state tuition program as made ratably over a 5-year period beginning this year." The instructions for Form 709 for gifts made during calendar year 2002 (instructions for Form 709) stated:

> If your total 2002 contributions to a qualified state tuition program on behalf of any individual beneficiary exceed $11,000, then for purposes of the annual exclusion you may elect under section

**[*107]** 529(c)(2)(B) to treat up to $55,000 of your total contributions as having been made ratably over a 5-year period beginning in 2002.

You must report in 2002 the entire amount of the contribution in excess of $55,000.

You make the election by checking the box on line B at the top of Schedule A.  The election must be made for the calendar year in which the contribution is made.  Also attach an explanation that includes the following:

- The total amount contributed per individual beneficiary;
- The amount for which the election is being made; and
- The name of the individual for whom the contribution was made.

If you make this election, report only 1/5 (20%) of your total contributions (up to $55,000) on the 2002 Form 709.  You must then report an additional 20% of the total in each of the succeeding 4 years. * * * If, in any of the 4 years following the election, you are not required to file Form 709 other than to report that year's portion of the election, you do not need to file or otherwise report that year's portion.

As discussed above, on April 17, 2006, Mr. Beyer timely filed his 2005 gift tax return, in which he showed total gift tax due of $659,660.  Mr. Beyer included Schedule A (2005 Form 709 Schedule A) as part of his 2005 gift tax return.  In the 2005 Form 709 Schedule A, Mr. Beyer showed that he had made cash gifts of $1,250,000 to each of Craig Plassmeyer and Bruce Plassmeyer.  In the 2005 Form 709 Schedule A, Mr. Beyer applied the section 2503(b) annual exclusion amount

[*108] of $11,000 to his cash gift of $1,250,000 to each of Craig Plassmeyer and Bruce Plassmeyer.

Mr. Beyer did not show in the 2005 Form 709 Schedule A or anywhere else in his 2005 gift tax return the $55,000 contribution to each of eight 2004 section 529 accounts that he had made during his taxable year 2005. Line B of Schedule A attached to Form 709 for gifts made during calendar year 2005 contained a box and stated: "Check here if you elect under section 529(c)(2)(B) to treat any transfers made this year to a qualified tuition program as made ratably over a 5-year period beginning this year." The instructions for Form 709 for gifts made during calendar year 2005 stated:

> If in 2005, you contributed more than $11,000 to a qualified tuition program (QTP) on behalf of any one person, you may elect to treat up to $55,000 of the contribution for that person as if you had made it ratably over a 5-year period. The election allows you to apply the annual exclusion to a portion of the contribution in each of the 5 years, beginning in 2005. You can make this election for as many separate people as you made QTP contributions.
>
> You can only apply the election to a maximum of $55,000. You must report in 2005 all of your QTP contributions for any single person that exceed $55,000 (in addition to any other gifts you made to that person).
>
> For each of the 5 years, you report in Part 1 of Schedule A, 1/5 (20%) of the amount for which you made the election. In column E of Part 1 (Schedule A), list the date of the gift as the calendar year for

[*109] which you are deemed to have made the gift. Do not list the year of contribution for subsequent years.

However, if in any of the last 4 years of the election, you did not make any other gifts that would require you to file a Form 709, you do not need to file Form 709 to report that year's portion of the election amount.

\*        \*        \*        \*        \*        \*        \*

You make the election by checking the box on line B at the top of Schedule A. The election must be made for the calendar year in which the contribution is made. Also attach an explanation that includes the following:

• The total amount contributed per individual beneficiary,
• The amount for which the election is being made, and
• The name of the individual for whom the contribution was made.

The box at line B of the Schedule A attached to Mr. Beyer's 2005 gift tax return was left blank.

On January 24, 2011, pursuant to section 6020(b), respondent prepared a substitute for Mr. Beyer's gift tax return for his taxable year 2002. Decedent's estate did not pay the gift tax due shown in that gift tax return.

Estate Tax Return

As indicated previously, around February 14, 2008, Craig Plassmeyer, as executor of decedent's estate, filed Form 706 on behalf of decedent (estate tax return). That return showed net estate tax of $9,345,334. That tax was paid by a

[*110] check that Craig Plassmeyer signed on February 18, 2008, that was drawn on the EGBLP Chase account, that was payable to the IRS, and that was in the amount of $9,345,334. In the estate tax return, decedent's estate elected to use the alternate valuation date of November 19, 2007.

Decedent's estate included with the estate tax return Schedule G, Transfers During Decedent's Life (Form 706 Schedule G). Decedent's estate showed in that schedule total assets of $24,838,479. Decedent's estate included in the value of Mr. Beyer's gross estate the values of the respective assets that the Living Trust and Management Trust held on the date of his death. That was because Mr. Beyer had reserved for himself the power during his lifetime to amend and revoke each of those trusts. Thus, in Form 706 Schedule G, decedent's estate reported, inter alia, the value of the Beyer Irrevocable Trust promissory note that the Living Trust held and the one-percent general partnership interest in EGBLP that the Management Trust held.

In the estate tax return, decedent's estate included in the value of the gross estate a portion of the total contributions that Mr. Beyer had made to each of the

[*111] 2004 section 529 accounts and noted that the value "represents [the] unexpired period of the special 5-year averaging election."[31]

Notice of Deficiency

Sometime before March 27, 2009, respondent began an examination of the estate tax return. As a result of respondent's examination, on February 8, 2011, respondent timely issued to decedent's estate a notice of deficiency (notice). In that notice, respondent determined a deficiency in estate tax with respect to decedent's estate.

Respondent also determined in the notice a deficiency in, and additions under section 6651(a)(1) and (2) to, Mr. Beyer's gift tax for his taxable year 2002[32] and a deficiency in, and an accuracy-related penalty under section 6662(a) on, Mr. Beyer's gift tax for his taxable year 2005.

OPINION

Decedent's estate bears the burden of establishing that the determinations in the notice that remain at issue are erroneous, see Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933), unless that burden shifts to respondent under section

---

[31]As note above, Mr. Beyer died within five years after he made the contributions to each of the 2004 section 529 accounts.

[32]Respondent had prepared a substitute for gift tax return for Mr. Beyer's taxable year 2002 that showed gift tax of $174,300.

[*112] 7491(a).  The parties disagree over whether the burden of proof in this case shifts to respondent under that section.

In order for the burden of proof to shift to the Commissioner of Internal Revenue (Commissioner) under section 7491(a), the taxpayer must (1) provide credible evidence with respect to any factual issue relevant to determining the tax liability of the taxpayer and (2) comply with the applicable requirements of section 7491(a)(2).  Although section 7491(a) does not define the term "credible evidence", the legislative history of the statute does.  The legislative history of section 7491(a) provides in pertinent part:

> Credible evidence is the quality of evidence which, after critical analysis, the court would find sufficient upon which to base a decision on the issue if no contrary evidence were submitted (without regard to the judicial presumption of IRS correctness). * * * The introduction of evidence will not meet this standard if the court is not convinced that it is worthy of belief. * * *

H.R. Conf. Rept. No. 105-599, at 240-241 (1998), 1998-3 C.B. 747, 994-995.

As discussed below, there are factual issues relevant to determining the estate tax liability of decedent's estate and the gift tax liability of decedent for each of his taxable years 2002 and 2005 with respect to which we conclude decedent's estate did not introduce credible evidence within the meaning of section 7491(a)(1).  On the record before us, we find that the burden of proof does

**[*113]** not shift to respondent under section 7491(a) with respect to any respective factual issues that pertain to the estate tax liability of decedent's estate and the gift tax liability of decedent for each of his taxable years 2002 and 2005.

Estate Tax

Section 2036(a)

It is respondent's position that the value of assets that Mr. Beyer transferred, through the 1999 Trust, to EGBLP and held by EGBLP on the date of Mr. Beyer's death is includible in the value of his gross estate under section 2036(a).[33] Decedent's estate disagrees.

---

[33]Respondent relies alternatively on secs. 2035(a) and 2038(a)(1) in support of respondent's position that the value of assets that Mr. Beyer transferred, through the 1999 Trust, to EGBLP and held by EGBLP on the date of Mr. Beyer's death is includible in the value of his gross estate. The parties proceed on the assumption that EGBLP should be treated as a partnership for purposes of analyzing the issues under secs. 2035(a), 2036(a), and 2038(a)(1). We have reservations regarding their assumption because a partnership for Federal tax purposes requires at least two members. See sec. 761(a); sec. 301.7701-2(c)(1), Proced. & Admin. Regs. Although the Living Trust and the Management Trust were named the limited partner and the general partner, respectively, of EGBLP, Mr. Beyer was considered to be the owner of the Living Trust and the Management Trust for purposes of secs. 671-679. Nonetheless, we proceed on the parties' assumption that EGBLP is a partnership for Federal tax purposes.

**[*114]**     In order to resolve the parties' dispute under section 2036(a),[34] we must consider the following factual issues with respect to Mr. Beyer's transfer of property to EGBLP:

(1) Was there a transfer of property by Mr. Beyer?

(2) If there was a transfer of property by Mr. Beyer, was such a transfer not a bona fide sale for an adequate and full consideration in money or money's worth?

(3) If there was a transfer of property by Mr. Beyer that was not a bona fide sale for an adequate and full consideration in money or money's worth, (a) did Mr.

---

[34]Sec. 2036(a) provides:

SEC. 2036.  TRANSFERS WITH RETAINED LIFE ESTATE.

(a) General Rule.--The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death--

(1) the possession or enjoyment of, or the right to the income from, the property, or

(2) the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom.

[*115] Beyer retain the possession or the enjoyment of, or the right to the income from, the property transferred within the meaning of section 2036(a)(1) or (b) did he retain, either alone or in conjunction with any person, the right to designate the persons who shall possess or enjoy the property transferred or the income therefrom within the meaning of section 2036(a)(2)?

### Transfer of Property by Mr. Beyer

Decedent's estate acknowledges that Mr. Beyer, through the 1999 Trust,[35] transferred property to EGBLP on April 20, 2004. (Mr. Beyer's April 2004 transfer to EGBLP). In the light of that acknowledgment by decedent's estate, we find that Mr. Beyer's April 2004 transfer to EBGLP was a transfer of property under section 2036(a).

### Transfer Other Than a Bona Fide Sale for an Adequate and Full Consideration in Money or Money's Worth

Section 2036(a) excepts from its application any transfer of property otherwise subject to that section which is a "bona fide sale for an adequate and full consideration in money or money's worth" (sometimes, bona fide sale exception). The foregoing exception is limited to a transfer of property where the transferor

---

[35]For convenience, we shall generally refer only to Mr. Beyer when discussing hereinafter Mr. Beyer's transfer, through the 1999 Trust, to EGBLP on April 20, 2004.

[*116] "has received benefit in full consideration in a genuine arm's length transaction". Estate of Goetchius v. Commissioner, 17 T.C. 495, 503 (1951).

We have held that the bona fide sale exception in section 2036(a) is satisfied in the context of a family limited partnership

> where the record establishes the existence of a legitimate and significant nontax reason for creating the family limited partnership, and the transferors received partnership interests proportionate to the value of the property transferred. See, e.g., Estate of Stone v. Commissioner, * * * [T.C. Memo. 2003-309]. The objective evidence must indicate that the nontax reason was a significant factor that motivated the partnership's creation. A significant purpose must be an actual motivation, not a theoretical justification. [Certain citations omitted.]

Estate of Bongard v. Commissioner, 124 T.C. 95, 118 (2005). Moreover, we must "separate the true nontax reasons for the entity's formation from those that merely clothe transfer tax savings motives." Id. at 121.

We also have held that the bona fide sale exception does not apply "where the facts fail to establish that the transfer was motivated by a legitimate and significant nontax purpose." Id. at 118; see Liljestrand v. Commissioner, T.C. Memo. 2011-259, 2011 WL 5213428, at *11-*12. In Estate of Bongard v. Commissioner, 124 T.C. at 118-119, we discussed a number of factors that support a finding that a transfer was not motivated by a legitimate and significant nontax purpose, including "the taxpayer standing on both sides of the transaction, the

[*117] taxpayer's financial dependence on distributions from the partnership, the partners' commingling of partnership funds with their own, and the taxpayer's actual failure to transfer the property to the partnership". (Citations omitted.)

In Liljestrand v. Commissioner, 2011 WL 5213428, at *11-*12, we concluded that the failure to follow partnership formalities also is a factor that supports a finding that a transfer was not motivated by a legitimate and significant nontax purpose.

We turn now to the respective arguments of the parties with respect to whether, as decedent's estate maintains, Mr. Beyer's April 2004 transfer to EGBLP was a bona fide sale for an adequate and full consideration in money or money's worth within the meaning of section 2036(a). We consider first whether, as decedent's estate contends, Mr. Beyer had legitimate and significant nontax reasons for forming, and transferring assets to, EGBLP. In this connection, the parties agree that "[i]n creating the Partnership [EGBLP], Mr. Beyer desired to keep the Abbott stock in a block and keep his investment portfolio intact, wanted to transition Craig into managing assets, and wanted continuity of management."[36] (We shall refer to the desires which the parties agreed Mr. Beyer had when he

---

[36]Sec. 1.03 of EGBLP's agreement also contains a list of 28 so-called boilerplate purposes to be accomplished by forming EGBLP. Although that list contains 28 purposes, none of Mr. Beyer's desires is explicitly set forth in the list.

**[\*118]** formed, and transferred assets to, EGBLP as Mr. Beyer's desires.) According to decedent's estate, certain caselaw has found reasons such as Mr. Beyer's desires to be legitimate and significant nontax reasons for forming, and transferring assets to, a limited partnership such as EGBLP.

Respondent counters that Mr. Beyer's desires do not constitute legitimate and significant nontax reasons under applicable caselaw for forming, and transferring assets to, EGBLP. According to respondent, Mr. Beyer had no legitimate and significant nontax reason for doing so. Respondent maintains that Mr. Beyer's "[o]nly significant reason for the formation of the Partnership [, and transfer of assets to, EGBLP] was to attempt to generate transfer tax savings."

Before addressing the argument of decedent's estate that certain cases have found reasons such as Mr. Beyer's desires to be legitimate and significant nontax reasons for forming, and transferring assets to, a limited partnership such as EGBLP, we note section 1.03 of EGBLP's agreement contains a list of what appear to be 28 boilerplate purposes that Mr. Beyer wanted to accomplish by forming EGBLP. However, none of Mr. Beyer's desires are in that list.

**[\*119]**      We consider now decedent's estate's argument that certain cases[37]

have found reasons such as Mr. Beyer's desires to be legitimate and significant

nontax reasons for forming, and transferring assets to, a limited partnership such

as EGBLP.  We find the cases on which decedent's estate relies to be materially

distinguishable from the instant case and its reliance on those cases to be

misplaced.  Decedent's estate fails to acknowledge in advancing its argument

under those cases that any findings in those cases that reasons such as Mr. Beyer's

desires constitute legitimate and significant nontax reasons for forming, and

transferring assets to, a limited partnership such as EGBLP were based upon all of

the facts and circumstances that the courts found in those cases.

We address now whether on the record before us any of Mr. Beyer's desires

constitutes a legitimate and significant nontax purpose for forming, and

transferring assets to, EGBLP for purposes of the bona fide sale exception in

section 2036(a).  We turn first to whether Mr. Beyer's desire to keep the Abbott

---

[37]The caselaw on which decedent's estate relies to support its argument that
each of Mr. Beyer's desires has been "judicially affirmed" as a legitimate and
significant nontax reason for forming a partnership includes Estate of Black v.
Commissioner, 133 T.C. 340 (2009), Estate of Miller v. Commissioner, T.C.
Memo. 2009-119, Estate of Mirowski v. Commissioner, T.C. Memo. 2008-74,
Estate of Schutt v. Commissioner, T.C. Memo. 2005-126, Estate of Stone v.
Commissioner, T.C. Memo. 2003-309, and Estate of Murphy v. United States, No.
07-CV-1013, 2009 WL 3366099 (W.D. Ark. Oct. 2, 2009).

[*120] stock in a block and to maintain his investment portfolio intact constitutes such a purpose. Decedent's estate contends that if Mr. Beyer had not transferred to EGBLP assets that the 1999 Trust held in the 1999 Trust Banc One account, those assets would have been divided upon termination of the 1999 Trust and distributed among Craig Plassmeyer and his descendants per stirpes, Bruce Plassmeyer and his descendants per stirpes, and Doris Kaminski and her descendants per stirpes (1999 Trust beneficiaries). The facts that we have found belie that contention. Decedent's estate correctly states that pursuant to the 1999 Trust agreement assets that the 1999 Trust held were to be divided upon the termination of that trust and distributed among the 1999 Trust beneficiaries. However, Mr. Beyer could have amended the 1999 Trust agreement at any time to prevent those distributions from occurring.[38] Decedent's estate does not explain, and the record does not otherwise establish, why he did not do so or why he did not even consider doing so.

Moreover, Mr. Beyer's forming, and transferring assets to, EGBLP did not achieve Mr. Beyer's desire to keep the Abbott stock in a block and to maintain his

---

[38]The 1999 Trust agreement expressly allowed Mr. Beyer to amend that agreement. In fact, Mr. Beyer did not hesitate to amend that agreement when he wanted to do so, as evidenced by two amendments that he made to the 1999 Trust agreement.

[*121] investment portfolio intact. That is because EGBLP's agreement did not require EGBLP to continue to hold, before or after Mr. Beyer died, (1) the 800,000 shares of Abbott stock as a block or (2) the other assets that he transferred to EGBLP. In fact, decedent's estate acknowledges that "Craig had the power, if the need arose, to sell the Abbott stock, and he could have exercised that power if necessary."

On the record before us, we find that decedent's estate did not introduce credible evidence, see sec. 7491(a), and has failed to carry its burden of establishing that for purposes of the bona fide sale exception in section 2036(a) Mr. Beyer's desires to keep the Abbott stock in a block and to maintain his investment portfolio intact constitute a legitimate and significant nontax purpose for forming, and transferring assets to, EGBLP.

We turn next to decedent's estate's contention that for purposes of the bona fide sale exception in section 2036(a) Mr. Beyer's desire to transition Craig Plassmeyer into managing assets of Mr. Beyer constitutes a legitimate and significant nontax reason for forming, and transferring assets to, EGBLP. In support of that contention, decedent's estate maintains that forming EGBLP and designating Craig Plassmeyer as a co-trustee of the Management Trust, which was EGBLP's general partner, would provide him with the opportunity to manage Mr.

[*122] Beyer's assets. The facts that we have found belie that contention. Before Mr. Beyer formed, and transferred assets to, EGBLP, Craig Plassmeyer had the opportunity to, and in fact did, manage the 1999 Trust's assets that it held in the 1999 Trust Banc One account. In this connection, on October 29, 2001, Mr. Beyer executed a power of attorney that named Craig Plassmeyer as his attorney-in-fact and gave Craig Plassmeyer "BROAD POWERS TO HANDLE * * * [Mr. Beyer's] PROPERTY, WHICH MAY INCLUDE POWERS TO PLEDGE, SELL OR OTHERWISE DISPOSE OF ANY REAL OR PERSONAL PROPERTY WITHOUT ADVANCE NOTICE TO * * * [Mr. Beyer] OR APPROVAL BY * * * [Mr. Beyer]."[39] Moreover, Mr. Beyer could have amended the 1999 Trust agreement and named Craig Plassmeyer (or any other person or company) as the trustee, or as a co-trustee, of that trust during Mr. Beyer's lifetime, regardless of whether he formed EGBLP. Decedent's estate does not explain, and the record

_____

[39]We have also found that on October 13, 2003, Mr. Beyer signed three separate powers of attorney in order to supplement the power and authority that he granted to the trustees of the Living Trust. Each of those powers named Craig Plassmeyer as Mr. Beyer's attorney-in-fact and (1) granted him full power and authority to do everything necessary to transfer, assign, convey, and deliver to the Living Trust any interest in property owned by Mr. Beyer; (2) provided him the power to make health care decisions on behalf of Mr. Beyer; and (3) granted him the power to act on Mr. Beyer's behalf in the event of Mr. Beyer's disability. Moreover, after Mr. Beyer signed on October 13, 2003, the three separate powers of attorney, Craig Plassmeyer continued have the powers that Mr. Beyer gave him in the power of attorney that Mr. Beyer signed on October 29, 2001.

**[*123]** does not otherwise establish, why he did not do so or why he did not even consider doing so.

On the record before us, we find that decedent's estate did not introduce credible evidence, see sec. 7491(a), and has failed to carry its burden of establishing that for purposes of the bona fide sale exception in section 2036(a) Mr. Beyer's desire to transition Craig into managing Mr. Beyer's assets constitutes a legitimate and significant nontax purpose for forming, and transferring assets to, EGBLP.

We consider finally decedent's estate's contention that for purposes of the bona fide sale exception in section 2036(a) Mr. Beyer's desire to ensure continuity of management of his assets constitutes a legitimate and significant nontax reason for forming, and transferring assets to, EGBLP. Implicit in that contention is the assumption that if Mr. Beyer had not formed, and had not transferred assets to, EGBLP, the assets that the 1999 Trust held in the 1999 Trust Banc One account would not continue to be managed by the same managers. The facts that we have found belie that contention. As discussed previously, Mr. Beyer could have amended the 1999 Trust agreement and named Craig Plassmeyer (or any other person or company) as the trustee, or as a co-trustee, of that trust during Mr. Beyer's lifetime, regardless of whether he formed EGBLP. Decedent's estate does

**[\*124]** not explain, and the record does not otherwise establish, why he did not do so or why he did not even consider doing so.

On the record before us, we find that decedent's estate did not introduce credible evidence, see sec. 7491(a), and has failed to carry its burden of establishing that for purposes of the bona fide sale exception in section 2036(a) Mr. Beyer's desire to ensure continuity of management of his assets constitutes a legitimate and significant nontax purpose for forming, and transferring assets to, EGBLP.

On the record before us, we find that decedent's estate did not introduce credible evidence, see sec. 7491(a), and has failed to carry its burden of establishing that for purposes of the bona fide sale exception in section 2036(a) Mr. Beyer had any legitimate and significant nontax purpose for forming, and transferring assets to, EGBLP.

Assuming arguendo that decedent's estate had not failed to carry its burden of establishing that for purposes of the bona fide sale exception in section 2036(a) Mr. Beyer had a legitimate and significant nontax purpose for forming, and transferring assets to, EGBLP, we nonetheless would find on the record before us that decedent's estate has failed to carry its burden of establishing that the bona fide sale exception in section 2036(a) applies to Mr. Beyer's April 2004 transfer to

[*125] EBGLP.  That is because decedent's estate has failed to carry its burden of establishing that Mr. Beyer received an adequate and full consideration in money or money's worth within the meaning of section 2036(a) for Mr. Beyer's April 2004 transfer to EBGLP.

In support of its argument that Mr. Beyer received an adequate and full consideration in money or money's worth within the meaning of section 2036(a) for Mr. Beyer's April 2004 transfer to EBGLP, decedent's estate contends that (1) Mr. Beyer received, through the Living Trust and the Management Trust, an interest in EGBLP proportionate to the value of assets that he transferred to it; (2) the respective capital accounts that EGBLP maintained for the Living Trust and the Management Trust were properly credited with those assets; and (3) in the event of the liquidation and the dissolution of EGBLP the Living Trust and the Management Trust had the right to distributions of property from EGBLP in accordance with their respective capital accounts.  On the record before us, we reject those contentions.

EGBLP's agreement required EGBLP to establish and maintain respective capital accounts for all of its partners, including any general partner and any limited partner, and to show in those accounts the respective interests that those partners received in exchange for any initial and subsequent contribution that any

[*126] such partner made to EGBLP.  The record does not establish that EGBLP

satisfied those requirements of the EGBLP agreement.  Indeed, the record does not

establish that EGBLP established and maintained respective capital accounts for

its partners, let alone that it showed in those accounts the respective interests that

those partners received in exchange for any initial and subsequent contribution

that any such partner made to EGBLP.[40]

On the record before us, we find that decedent's estate did not introduce

credible evidence, see sec. 7491(a), and has failed to carry its burden of

establishing that Mr. Beyer received an adequate and full consideration in money

or money's worth within the meaning of section 2036(a) for Mr. Beyer's April

2004 transfer to EGBLP.

Based upon our examination of the entire record before us, we find that

decedent's estate has failed to carry its burden of establishing that Mr. Beyer's

April 2004 transfer to EGBLP was a bona fide sale for an adequate and full

---

[40]The only documents in the record that purport to show the respective
capital accounts of EGBLP's partners are the respective Schedules K-1 that
EGBLP attached to EGBLP's original partnership returns, EGBLP's amended
partnership returns filed in 2008, and EGBLP's amended partnership returns filed
in 2009.  We have found that those schedules have certain inconsistencies, and
decedent's estate acknowledges that certain erroneous information appears in
those schedules.  We are unwilling to rely on the various Schedules K-1 to which
decedent's estate directs our attention to establish its contention that EGBLP
established and maintained capital accounts for each of its partners.

**[*127]** consideration in money or money's worth within the meaning of section 2036(a). Based upon that examination, we further find that the bona fide sale exception in section 2036(a) does not apply to Mr. Beyer's April 2004 transfer to EGBLP.

Possession or Enjoyment of, or Right to
Income From, the Property Transferred

Under section 2036(a)(1), "[a]n interest or right is treated as having been retained or reserved if at the time of the transfer there was an understanding, express or implied, that the interest or right would later be conferred." Sec. 20.2036-1(c)(1)(i), Estate Tax Regs. The existence of an implied agreement or understanding "is a question of fact that can be inferred from the circumstances surrounding a transfer of property and the subsequent use of the transferred property." Estate of Bongard v. Commissioner, 124 T.C. at 129 (citing Estate of Thompson v. Commissioner, 382 F.3d 367, 376 (3d Cir. 2004), and Estate of Reichardt v. Commissioner, 114 T.C. 144, 151 (2000)). In certain estate tax cases involving assets that an individual who later died transferred to a limited partnership, we found that certain facts, including whether the decedents in those cases continued to use assets that they transferred to the partnership and whether they transferred almost all of their assets to the partnership, demonstrated that at

[*128] the time of the transfers in question there was an implied agreement to retain the possession or the enjoyment of, or the right to the income from, assets that the decedents in those cases transferred to the partnership within the meaning of section 2036(a)(1). See Estate of Bongard v. Commissioner, 124 T.C. at 129-131; Estate of Reichardt v. Commissioner, 114 T.C. at 151-153; Estate of Miller v. Commissioner, T.C. Memo. 2009-119, 2009 WL 1472208, at *15; Estate of Jorgensen v. Commissioner, T.C. Memo. 2009-66, 2009 WL 792071, at *14, aff'd, 431 F. App'x 544 (9th Cir. 2011); Estate of Harper v. Commissioner, T.C. Memo. 2002-121, 2002 WL 992347, at *12.

Decedent's estate bears the burden, which is especially onerous for transactions involving family members, of establishing that at the time of Mr. Beyer's April 2004 transfer of property to EGBLP there was no implied agreement or understanding that he retain the possession or the enjoyment of, or the right to the income from, those assets within the meaning of section 2036(a)(1). See Estate of Reichardt v. Commissioner, 114 T.C. at 151; Estate of Turner v. Commissioner, T.C. Memo. 2011-209, 2011 WL 3835663, at *18.

Decedent's estate argues that the totality of the circumstances demonstrates that at the time of Mr. Beyer's April 2004 transfer of property to EGBLP there was no implied agreement or understanding that he retain the possession or the

[*129] enjoyment of, or the right to the income from, assets that he transferred to EGBLP within the meaning of section 2036(a)(1).

Respondent's disagrees. According to respondent, Mr. Beyer continued to use assets that he transferred to EGBLP, and he failed to retain sufficient assets outside of EGBLP to pay his anticipated financial obligations.

We address first respondent's argument that Mr. Beyer continued to use assets that he transferred to EGBLP. In support of that argument, respondent relies on a number of payments that EGBLP made to the Living Trust at a time when that trust no longer held a limited partnership interest in EGBLP. EGBLP made one of those payments on April 17, 2006. On that date, there was a transfer of $659,660 from the EGBLP Chase account to the Living Trust account. Decedent's estate contends that EGBLP's payment to the Living Trust on April 17, 2006, was an interest payment on the Beyer Irrevocable Trust promissory note, which EGBLP made to the Living Trust on behalf of the Beyer Irrevocable Trust, a limited partner in EGBLP at the time of that payment.

The $659,660 that EGBLP paid to the Living Trust on April 17, 2006, is not equal to the amount of the interest that was payable by the Beyer Irrevocable Trust each calendar quarter on the 15th day of the month (i.e., $116,071.16) on the Beyer Irrevocable Trust promissory note. Moreover, on April 17, 2006, when

**[*130]** EGBLP made the transfer of $659,660 to the Living Trust, no interest was due to be paid on that note.[41] In addition, when EGBLP paid the Living Trust $659,660 on April 17, 2006, the Living Trust was not a partner in EGBLP and therefore was not entitled to receive distributions from EGBLP. Finally, we have found that the Living Trust used the $659,660 that it received from EGBLP to pay Mr. Beyer's 2005 gift tax liability of $659,660.

On the record before us, we find that the transfer of $659,660 from the EGBLP Chase account to the Living Trust account supports respondent's position that at the time Mr. Beyer transferred certain assets to EGBLP there was an implied agreement or understanding that he retain the possession or the enjoyment of, or the right to the income from, assets that he transferred to EGBLP within the meaning of section 2036(a)(1).

---

[41]Pursuant to the Beyer Irrevocable Trust promissory note, the Beyer Irrevocable Trust was required to make an interest payment of $116,071.16 to the Living Trust, inter alia, on March 15, 2006. The record does not establish whether the Beyer Irrevocable Trust made that payment on that date. If it did not, it is possible that the payment of $659,660 that EGBLP made to the Living Trust on April 17, 2006, included a late payment on behalf of the Beyer Irrevocable Trust of the interest of $116,071.16 that the Beyer Irrevocable Trust had been required to, but did not, make to the Living Trust on March 15, 2006. However, decedent's estate has failed to carry its burden of establishing any such facts.

[*131]    In further support of respondent's argument that Mr. Beyer continued to use assets that he transferred to EGBLP, respondent relies on the following transfers from the EGBLP Chase account to the Living Trust account:

| Date | Amount |
|------|--------|
| 6/12/2006 | [1]$116,071.16 |
| 9/8/2006 | 116,071.16 |
| 12/14/2006 | 116,071.16 |
| 2/26/2007 | 116,071.16 |
| 5/18/2007 | 116,071.16 |
| 10/9/2007 | 116,071.16 |
| 12/7/2007 | 116,071.16 |
| 2/21/2008 | 116,071.16 |

    [1]In an email dated September 29, 2007, from Ms. Smid to Craig Plassmeyer, Ms. Smid stated that on June 12, 2006, a transfer of $117,375.34, instead of $116,071.16, had been made from the EGBLP Chase account to the Living Trust Banc One account. In the same email, Ms. Smid stated that to correct that error Chase transferred the difference of $1,304.18 from the Living Trust Banc One account to the EGBLP Chase account.

    We have found that at the time EGBLP made each payment of $116,071.16 (listed above) to the Living Trust the Beyer Irrevocable Trust owned a 99-percent limited partnership interest in EGBLP and consequently was entitled to receive distributions from EGBLP. We have further found that at each of those times each of those payments was an interest payment on the Beyer Irrevocable Trust

[*132] promissory note that EGBLP made to the Living Trust on behalf of the Beyer Irrevocable Trust.

On the record before us, we find that none of the payments of $116,071.16 (listed above) that EGBLP made to the Living Trust supports respondent's position that at the time Mr. Beyer transferred certain assets to EGBLP there was an implied agreement or understanding that he retain the possession or the enjoyment of, or the right to the income from, assets that he transferred to EGBLP within the meaning of section 2036(a)(1).

In further support of respondent's argument that Mr. Beyer continued to use assets that he transferred to EGBLP, respondent relies on a transfer of $9,945,000 made on February 19, 2008, from the EGBLP Chase account to the Living Trust account. Decedent's estate contends that under Estate of Mirowski v. Commissioner, T.C. Memo. 2008-74, EGBLP's transfer of $9,945,000 is irrelevant because "post-death treatment of the Partnership's assets is irrelevant to a section 2036 inquiry". Assuming arguendo that Estate of Mirowski held what decedent's estate claims it held, we find Estate of Mirowski to be materially distinguishable from the instant case and decedent's estate's reliance on that case to be misplaced. We must nonetheless address whether the transfer of $9,945,000 made on February 19, 2008, from the EGBLP Chase account to the Living Trust

[*133] account supports respondent's position that at the time Mr. Beyer transferred certain assets to EGBLP there was an implied agreement or understanding that he retain the possession or the enjoyment of, or the right to the income from, assets that he transferred to EGBLP within the meaning of section 2036(a)(1).

The Living Trust agreement that Mr. Beyer signed in order to create the Living Trust, which Mr. Beyer formed on the same day (i.e., October 13, 2003) on which he formed EGBLP, obligated the Living Trust to pay any death taxes due after Mr. Beyer died. Mr. Beyer's will, which he also executed on October 13, 2003, did not obligate his probate estate to those death taxes. After the Living Trust transferred the 99-percent limited partnership interest in EGBLP that it had owned to the Beyer Irrevocable Trust (i.e., after the Living Trust 2005 transfer), Mr. Beyer knew that the Living Trust was no longer a partner in EGBLP and consequently the Living Trust was no longer entitled to distributions that EGBLP decided to make to its partners pursuant to the EGBLP agreement. Mr. Beyer also knew after the Living Trust 2005 transfer that the Living Trust's total assets consisted of the Living Trust account, which contained approximately $600,000, and the Beyer Irrevocable Trust promissory note, which had a face amount of $20,866,725. Nonetheless, after the Living Trust 2005 transfer Mr. Beyer did not

**[\*134]** contribute additional assets to the Living Trust, in order to ensure that the Living Trust would have enough assets to satisfy its obligation under the Living Trust agreement to pay death taxes. Moreover, after the Living Trust 2005 transfer, Mr. Beyer did not amend the Living Trust agreement to eliminate the Living Trust's obligation to pay those taxes. Nor did he amend his will to place that obligation on his probate estate. In addition, after Mr. Beyer's death on May 19, 2007, the Living Trust did not attempt to borrow against the Beyer Irrevocable Trust promissory note in order to acquire enough cash to satisfy its obligation under the Living Trust agreement to pay death taxes.

On the record before us, we find that Mr. Beyer knew not only at the time he formed EGBLP and the Living Trust and executed his will but also at the time and after the Living Trust sold its limited partnership interest in EGBLP to the Beyer Irrevocable Trust that the Living Trust would need to use a very substantial amount of assets of EGBLP in order to satisfy its obligation under the Living Trust agreement to pay death taxes. He also knew after the Living Trust sold its limited partnership interest in EGBLP to the Beyer Irrevocable Trust that the Living Trust no longer had sufficient liquid assets to satisfy that obligation and that the Living Trust was no longer entitled to any assets of EGBLP. See Estate of Miller v. Commissioner, T.C. Memo. 2009-119.

[*135]     On the record before us, we find that the payment of $9,945,000 that EGBLP made to the Living Trust after Mr. Beyer died supports respondent's position that at the time Mr. Beyer transferred certain assets to EGBLP there was an implied agreement or understanding that he retain the possession or the enjoyment of, or the right to the income from, assets that he transferred to EGBLP within the meaning of section 2036(a)(1).

On the record before us, we find that decedent's estate did not introduce credible evidence, see sec. 7491(a)(1), and has failed to carry its burden of establishing that Mr. Beyer did not continue to use assets that he transferred to EGBLP after Mr. Beyer's April 2004 transfer to EGBLP.

We next address respondent's argument, in support of respondent's position that at the time Mr. Beyer transferred certain assets to EGBLP there was an implied agreement or understanding that he retain the possession or the enjoyment of, or the right to the income from, assets that he transferred to EGBLP within the meaning of section 2036(a)(1), that Mr. Beyer failed to retain sufficient assets outside of EGBLP to pay his anticipated financial obligations. The parties agree that Mr. Beyer retained, either personally or through the Living Trust, and did not transfer to EGBLP, assets valued at approximately $4 million. However, the

[*136] parties disagree over whether those assets were sufficient to satisfy Mr. Beyer's anticipated financial obligations.

We have found that on May 20, 2005, after Mr. Beyer transferred certain of his assets to EGBLP, he made a gift of $1,250,000 to each of Craig Plassmeyer and Bruce Plassmeyer. Those gifts totaling $2,500,000 obviously reduced the total amount of assets that the parties agree Mr. Beyer retained outside of EGBLP (i.e., approximately $4 million) to approximately $1,500,000. We have also found that Mr. Beyer used EGBLP assets to pay his 2005 gift tax liability of $659,660. On the record before us, we find that Mr. Beyer would have not used EGBLP assets to pay his 2005 gift tax liability (1) if, as decedent's estate contends, Mr. Beyer had retained sufficient assets outside of EGBLP to satisfy his anticipated financial obligations and/or (2) if, as decedent's estate also contends, at the time Mr. Beyer transferred certain assets to EGBLP there was no implied agreement or understanding that he retain the possession or the enjoyment of, or the right to the income from, assets that he transferred to EGBLP within the meaning of section 2036(a)(1).

On the record before us, we find that decedent's estate did not introduce credible evidence, see sec. 7491(a)(1), and has failed to carry its burden of

[*137] establishing that Mr. Beyer retained sufficient assets outside of EGBLP to satisfy his anticipated financial obligations.

Based upon our examination of the entire record before us, we find that decedent's estate has failed to carry its burden of establishing that at the time Mr. Beyer transferred certain assets to EGBLP there was no implied agreement or understanding that he retain the possession or the enjoyment of, or the right to the income from, assets that he transferred to EGBLP within the meaning of section 2036(a)(1). Based upon our examination of that record, we further find that decedent's estate has failed to carry its burden of establishing that Mr. Beyer did not retain the possession or the enjoyment of, or the right to the income from, assets that he transferred to EGBLP within the meaning of section 2036(a)(1).[42]

Based upon our examination of the entire record before us, we find that decedent's estate has failed to carry its burden of establishing that the value of the assets that EGBLP held on the date of decedent's death is not includible in the value of his gross estate under section 2036(a)(1).[43]

---

[42]Because of our finding under sec. 2036(a)(1), we need not consider respondent's alternative argument under sec. 2036(a)(2).

[43]Because of our finding under sec. 2036(a)(1), we need not consider respondent's alternative arguments under secs. 2035(a) and 2038(a).

**[*138]**     Value of Assets Includible in the Value of the
             <u>Gross Estate of Decedent Under Section 2036(a)(1)</u>

The parties stipulated the net asset value on the alternate valuation date[44] of assets of EGBLP in the event that we were to find, which we have, that the value of those assets is includible in the value of the gross estate of decedent. However, they disagree over whether that value should be discounted, as decedent's estate maintains, in determining the value on that alternate valuation date of those assets because certain of those assets were held in the restricted management account (i.e., the RMA).

Under the terms of the investment agreement of Capital Trust, to which the Management Trust, as the general partner of EGBLP, and Capital Trust, as the agent of EGBLP, agreed, Capital Trust was to hold in the RMA, which was subject to the terms of that agreement, 75 percent of EGBLP's assets for four years. During that four-year period, the Capital Trust investment agreement (1) required dividends and interest on assets held in the RMA to be distributed to EGBLP and (2) prohibited the distribution of principal from the RMA to EGBLP. In addition, the investment agreement of Capital Trust permitted EGBLP to transfer "all or any part of the * * * [RMA]" after receiving the written consent of

---

[44]Decedent's estate elected to use the alternate valuation date of November 19, 2007. <u>See</u> sec. 2032(a).

[*139] Capital Trust but only to a permitted transferee, as defined in the Capital Trust investment agreement, who executes certain documents.[45] The Capital Trust investment agreement did not prohibit Capital Trust from selling assets held in the RMA.

It is the position of decedent's estate that a discount should be applied to the stipulated net asset value of assets of EGBLP in order to take into account the restrictions that the Capital Trust investment agreement imposed on the RMA, to which EGBLP had transferred 75 percent of its assets when the RMA was created.[46]

---

[45]The investment agreement of Capital Trust provided the following definition of the term "permitted transferee":

> any one or more of the following:  (a) * * * [decedent's] ancestors, and * * * [decedent's] descendants; (b) one or more organizations described in Sections 170(c), 2055(a), and 2522(a) of the Code; (c) the decedent's estate or guardianship estate of any of the persons listed in (a), or a revocable trust substitute for a decedent's estate, exclusively for the benefit of one or more of the persons listed in (a), and (d) a trust the terms of which provide that the account is held, at the time of the Transfer of the Account to the trust, exclusively for the benefit of one or more of the persons listed in (a):  provided, however, for purposes of (c) and (d) above, the remaindermen of a trust shall not be considered in determining whether a trust is exclusively for the benefit of one or more of the persons listed in (a).

[46]Decedent's estate advances no argument in support of its position that a discount should be applied to the stipulated net asset value on the alternate

(continued...)

**[\*140]**       In support of respondent's position that the stipulated net asset value

on the alternate valuation date of assets of EGBLP should not be discounted to

take into account the restrictions that the Capital Trust investment agreement

imposed on the RMA,[47] respondent relies on Estate of Kahn v. Commissioner, 125

T.C. 227(2005), and Estate of Foster v. Commissioner, T.C. Memo. 2011-95, 2011

WL 1598633, aff'd, 565 F. App'x 654 (9th Cir. 2014).[48]

In Estate of Kahn, the value of each of two individual retirement accounts

(IRAs), which held certain marketable securities, was includible under section

2039(a) in the value of the gross estate of the decedent involved in that case.  One

of the issues there was whether it was appropriate to apply a discount to assets

---

[46](...continued)
valuation date of assets of EGBLP.  Decedent's estate merely argues about why
what it claims is respondent's position is wrong.  We note that respondent is not
even taking the position with respect to the valuation discount issue that
decedent's estate claims it is taking.

[47]Decedent's estate advances no argument to refute respondent's position
that the stipulated net asset value on the alternate valuation date of assets of
EGBLP should not be discounted to take into account the restrictions that the
Capital Trust investment agreement imposed on the RMA.

[48]Respondent also relies on Rev. Rul. 2008-35, 2008-29 I.R.B. 116, which
we shall not consider.  Revenue rulings are not regarded as precedent in this
Court.  They merely represent the position of the Commissioner of Internal
Revenue on a particular issue.  See Alumax, Inc. v. Commissioner, 109 T.C. 133,
163 n.12 (1997), aff'd, 165 F.3d 822 (11th Cir. 1999).

[*141] held in each of the IRAs in determining the value of each of those IRAs to be included in the value of the gross estate of the decedent involved in that case. See Estate of Kahn v. Commissioner, 125 T.C. at 228. In Estate of Kahn, although the terms of each of the IRAs prohibited that decedent from selling any interest therein, those terms permitted the marketable securities that were held in those IRAs to be sold. See id. at 229. We concluded in Estate of Kahn that, in determining the fair market value[49] of each of the IRAs "under the willing buyer-willing seller test, we must take into account what would actually be sold--the securities." Id. at 241. On the record presented to us in that case, we held that, in determining the fair market value of each of the IRAs, it was not appropriate to apply a discount to the value of the securities held in each of those IRAs. See id. at 241-242.

In Estate of Foster v. Commissioner, 2011 WL 1598633, the total value of assets held in a marital trust, whose sole beneficiary was the decedent involved in

---

[49]The term "fair market value" is defined as the price at which property would "change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." Estate of Kahn v. Commissioner, 125 T.C. 227, 230-231 (2005) (quoting United States v. Cartwright, 411 U.S. 546, 551 (1973); see sec. 20.2031-1(b), Estate Tax Regs.). In determining the fair market value of an asset, it is appropriate to apply a discount to take account of one or more restrictions that would affect the price at which a willing buyer would purchase and a willing seller would sell the asset. See Estate of Kahn v. Commissioner, 125 T.C. at 234-242.

[*142] that case, was includible in the value of the gross estate of that decedent. One of the issues there was whether it was appropriate to apply a discount to assets held in the marital trust in determining the value that was to be included in the gross estate of that decedent. See id. at *7. In Estate of Foster, the marital trust agreement appointed a trust company and the decedent there as co-trustees of the marital trust and gave the co-trustees the right to sell assets held in, and to buy assets to be held in, the marital trust. See id. at *10. The marital trust agreement also gave the co-trustees the right, in their discretion, to distribute the principal of the marital trust for the decedent's benefit. Id. at *2. Pursuant to the terms of the marital trust agreement, the decedent in Estate of Foster had the right during her life to withdraw at her request any part of the principal of the marital trust. Id. At some time after the creation of the marital trust, the trust company in its capacity as a co-trustee "unilaterally froze", in order to avoid potential liability of certain persons for distributions from the marital trust, the right of the decedent in that case to withdraw at her request principal from that trust. See id. On the record presented to us in Estate of Foster, we held that, in determining the fair market value of assets held in the marital trust under the willing buyer-willing seller test,[50] it was not appropriate to apply a discount to those assets. See id. at *10-*11.

---

[50]See supra note 49.

**[\*143]**     We find the facts of each of the cases on which respondent relies to be indistinguishable in material respects from the facts in the instant case.  One indistinguishable material fact in each of those cases and in the instant case is that the governing instrument there and here (i.e., the Capital Trust investment agreement) did not prohibit the sale of assets, the value of which for estate tax purposes was there and is here at issue.

On the record before us, we find that, in determining the fair market value on the alternate valuation date of assets of EGBLP that we have held is includible in the value of the gross estate of decedent, it is not appropriate under the willing buyer-willing seller test to apply a discount to the stipulated net asset value on the alternate valuation date of those assets in order to take into account the restrictions that the Capital Trust investment agreement imposed on the RMA, which held 75 percent of assets of EGBLP when the RMA was created.

Based upon our examination of the entire record before us, we find that decedent's estate must include in the value of the gross estate of decedent the value on the alternate valuation date of assets of EGBLP, which the parties stipulated, that we have held is includible in that gross estate under section 2036(a)(1).

[*144] <u>Gift Tax</u>

<u>Section 529 Accounts</u>

We address next whether, as respondent argues, the $55,000 that Mr. Beyer contributed to each of ten 2001 section 529 accounts on January 3, 2002, and the $55,000 that he contributed to each of eight 2004 section 529 accounts on January 6, 2005, are taxable gifts that increase Mr. Beyer's gift tax liabilities for his taxable years 2002 and 2005, respectively.  In order to resolve the parties' dispute regarding that issue, we must determine whether Mr. Beyer made an election under section 529(c)(2)(B) to treat those contributions as made ratably over a five-year period as provided in that section.

Decedent's estate argues that although Mr. Beyer did not file Form 709 for his taxable year 2002 and did not make a section 529(c)(2)(B) election in Form 709 that he filed for his taxable year 2005,[51] Mr. Beyer nonetheless intended to, and therefore did, elect to treat the ten $55,000 contributions in question during

_____

[51]Schedule A that is part of Form 709 contains a box at Line B, which provided the following instructions:  "Check here if you elect under section 529(c)(2)(B) to treat any transfers made this year to a qualified tuition program as made ratably over a 5-year period beginning this year.  See Instructions.  Attach explanation."  Mr. Beyer did not check that box in Schedule A that he included with Form 709 that he filed for his taxable year 2005.

[*145] his taxable year 2002 and the eight $55,000 contributions in question during his taxable year 2005 as made ratably over a five-year period.

Respondent counters that the argument of decedent's estate should be rejected because Mr. Beyer did not make the election that section 529(c)(2)(B) requires in Form 709 for each of his taxable years 2002 and 2005.

Section 2503(a) defines the term "taxable gifts" to mean the total amount of gifts made during the calendar year, less certain statutory reductions. Section 2503(b) provides an inflation-adjusted annual exclusion from taxable gifts, which is applicable to each donee, for gifts "other than gifts of future interests in property". (We shall sometimes refer to the inflation-adjusted annual gift exclusion amount that is applicable to each donee as the maximum annual exclusion amount). For each of calendar years 2002 and 2005, the maximum annual gift exclusion amount was $11,000 for each donee. See sec. 2503(b); Rev. Proc. 2004-71, 2004-2 C.B. 970; Rev. Proc. 2001-59, 2001-2 C.B. 623.

Section 529(c)(2) provides guidance regarding the gift tax treatment of contributions to a qualified tuition program (section 529 account), as defined in section 529(b). If the aggregate amount of contributions that a donor makes to a section 529 account on behalf of a single beneficiary during a calendar year does not exceed the maximum annual exclusion amount, the contributions made to the

**[*146]** section 529 account on behalf of that beneficiary will not be treated as taxable gifts. See sec. 529(c)(2). Moreover, if the aggregate amount of contributions that a donor makes to a section 529 account on behalf of a single beneficiary during a calendar year exceeds the maximum annual exclusion amount, "such aggregate amount shall, at the election of the donor, be taken into account for purposes of such section ratably over the 5-year period beginning with such calendar year." Sec. 529(c)(2)(B) (emphasis added). Where the aggregate amount of contributions that a donor makes to a section 529 account on behalf of a single beneficiary during a calendar year exceeds the maximum annual exclusion amount and the donor does not elect to treat that aggregate amount as made ratably over a five-year period, a taxable gift occurs. See id.

Section 529(c)(2)(B) does not explain how the donor must make the election that that section requires before the aggregate amount of contributions that a donor makes to a section 529 account on behalf of a single beneficiary during a calendar year which exceeds the maximum annual exclusion amount will be taken into account for purposes of that section as made ratably over a five-year period as provided in that section. We turn to the legislative history of section 529(c)(2) for guidance. That legislative history indicates that "[a] gift tax return must be filed with respect to any contribution in excess of the annual gift-tax

**[\*147]** exclusion limit, and the election for five-year averaging must be made on the contributor's gift tax return." H.R. Conf. Rept. No. 105-220, at 364 (1997), 1997-4 C.B. (Vol. 2) 1457, 1834.

Consistent with the legislative history of section 529(c)(2), the respective instructions for Forms 709 for gifts made during calendar year 2002 and for gifts made during calendar year 2005 state in pertinent part:

> You make the election by checking the box on line B at the top of Schedule A. The election must be made for the calendar year in which the contribution is made. Also attach an explanation that includes the following:
>
> • The total amount contributed per individual beneficiary;
> • The amount for which the election is being made; and
> • The name of the individual for whom the contribution was made.

Mr. Beyer did not, as discussed above, file Form 709 for his taxable year 2002. On the record before us, we find that decedent's estate did not introduce credible evidence, see sec. 7491(a)(1), and has failed to carry its burden of establishing that Mr. Beyer made an election under section 529(c)(2)(B) to treat the $55,000 that he contributed in 2002 to each of ten 2001 section 529 accounts as made ratably over a five-year period.

Although Mr. Beyer filed Form 709 for his taxable year 2005, he did not check the box at line B of Schedule A that he included with that form, which

[*148] would have constituted his election under section 529(c)(2)(B) "to treat any transfers made this year [2005] to a qualified tuition program as made ratably over a 5-year period beginning this year." On the record before us, we find that decedent's estate did not introduce credible evidence, see sec. 7491(a)(1), and has failed to carry its burden of establishing that Mr. Beyer made an election under section 529(c)(2)(B) to treat the $55,000 that he contributed in 2005 to each of eight 2004 section 529 accounts as made ratably over a five-year period.

Based upon our examination of the entire record before us, we find that decedent's estate has failed to carry its burden of establishing that the $55,000 that Mr. Beyer contributed in 2002 to each of ten 2001 section 529 accounts and in 2005 to each of eight 2004 section 529 accounts are not taxable gifts that Mr. Beyer made during his taxable years 2002 and 2005, respectively.

Additions to Tax and Accuracy-Related Penalty

Respondent determined that Mr. Beyer, and thus decedent's estate, is liable (1) for his taxable year 2002 for respective additions to gift tax under section 6651(a)(1) and (2) of $43,575 and $39,217 and (2) for his taxable year 2005 for an accuracy-related penalty on gift tax under section 6662(a) of $786,790.[52]

---

[52]Decedent's estate does not dispute the respective portions of the accuracy-related penalty under sec. 6662(a) for Mr. Beyer's taxable year 2005 that are

(continued...)

[*149]      Respondent bears the burden of production with respect to the

additions to tax under section 6651(a)(1) and (2) and the accuracy-related penalty

under section 6662(a) that respondent determined in the notice.  See sec. 7491(c);

Higbee v. Commissioner, 116 T.C. 438, 446-447 (2001).  To satisfy respondent's

burden of production, respondent must come forward with "sufficient evidence

indicating that it is appropriate to impose" those additions to tax and that penalty.

See Higbee v. Commissioner, 116 T.C. at 446.  Although respondent bears the

burden of production with respect to the additions to tax under section 6651(a)(1)

and (2) and the accuracy-related penalty under section 6662(a), respondent "need

not introduce evidence regarding reasonable cause * * * or similar provisions.

* * * [T]he taxpayer bears the burden of proof with regard to those issues."  Id.

### Section 6651(a)(1) and (2)

Section 6651(a)(1) imposes an addition to tax for failure to file, inter alia, a

gift tax return on the date on which such a return is required to be filed.  The

addition to tax for failure to file under section 6651(a)(1) does not apply if the

failure to file is due to reasonable cause and not due to willful neglect.

---

[52](...continued)
attributable to the underpayment of gift tax for that year with respect to certain
transfers, including the $20,000 transfer and the $12,000 transfer that he made in
that year to each of Craig Plassmeyer and Bruce Plassmeyer.

**[\*150]**      Section 6651(a)(2) imposes an addition to tax for failure to pay, inter alia, the gift tax shown in a gift tax return on or before the date on which such tax is required to be paid.  The addition to tax for failure to pay under section 6651(a)(2) does not apply if the failure to pay is due to reasonable cause and not due to willful neglect.

We have found that Mr. Beyer made taxable gifts during his taxable year 2002 when he contributed in that year $55,000 to each of ten 2001 section 529 accounts.  We have also found that Mr. Beyer did not file Form 709 for his taxable year 2002, see sec. 6651(a)(1), and that he did not pay the gift tax of $174,300 shown in the substitute for return that respondent had prepared under section 6020(b) for that year, see sec. 6651(a)(2), (g)(2); Cabirac v. Commissioner, 120 T.C. 163, 170 (2003), aff'd without published opinion, 94 A.F.T.R.2d (RIA) 2004-5490 (3d Cir. 2004).[53]  On the record before us, we find that respondent has carried respondent's burden of production under section 7491(c) with respect to the additions to tax under section 6651(a)(1) and (2) that respondent determined in the notice.

---

[53]For purposes of sec. 6651(a)(2), a return prepared by the Commissioner under sec. 6020(b) is treated as the return filed by the taxpayer.  See sec. 6651(g)(2); Cabirac v. Commissioner, 120 T.C. 163, 170 (2003), aff'd without published opinion, 94 A.F.T.R.2d (RIA) 2004-5490 (3d Cir. 2004).

[*151] With respect to the addition to tax under section 6651(a)(1) that respondent determined to impose with respect to Mr. Beyer's taxable year 2002, decedent's estate argues that Mr. Beyer's failure to file Form 709 for his taxable year 2002 was due to reasonable cause and not willful neglect. In support of that argument, decedent's estate contends that "Mr. Beyer and Craig [Plassmeyer] were advised and reasonably believed that Mr. Beyer had elected five-year averaging of his gifts to the 2001 * * * section 529 Plans and that no gift was required to be reported in a gift tax return". Those contentions are not supported by the record. In fact, the record does not establish that Mr. Beyer, or Craig Plassmeyer on his behalf, considered obtaining, let alone sought, qualified professional advice as to whether Mr. Beyer was required to file a gift tax return for his taxable year 2002. In response to a question by an attorney for decedent's estate on direct examination of Craig Plassmeyer as to whether Mr. Beyer filed a gift tax return for his taxable year 2002, he replied as follows: "In 2002, or whenever it was, I didn't realize I needed to file gift tax returns. I'd never filed them before. And * * * based on my understanding that it was within the usual exclusion I didn't even look at it."

[*152] On the record before us, we find that decedent's estate has failed to carry its burden of establishing that Mr. Beyer's failure to file Form 709 for his taxable year 2002 was due to reasonable cause and not willful neglect.

With respect to the addition to tax under section 6651(a)(2) that respondent determined to impose for Mr. Beyer's taxable year 2002, decedent's estate argues that Mr. Beyer's failure to pay gift tax for that taxable year was due to reasonable cause and not willful neglect. In support of that argument, decedent's estate advances essentially the same contentions that it advances in support of its position with respect to the addition to tax under section 6651(a)(1). We reject those contentions here for the same reasons that we rejected them in our consideration of section 6651(a)(1).

On the record before us, we find that decedent's estate has failed to carry its burden of establishing that Mr. Beyer's failure to pay the gift tax shown in the substitute Form 709 for 2002 was due to reasonable cause and not willful neglect.

Based upon our examination of the entire record before us, we find that decedent's estate has failed to carry its burden of establishing that Mr. Beyer, and thus decedent's estate, is not liable for Mr. Beyer's 2002 taxable year for the addition to tax under section 6651(a)(1) that respondent determined in the notice. On that record, we further find that decedent's estate has failed to carry its burden

[*153] of establishing that Mr. Beyer, and thus decedent's estate, is not liable for that year for the addition to tax under section 6651(a)(2) that respondent determined in the notice.

### Section 6662(a)

Section 6662(a) imposes an accuracy-related penalty of 20 percent of the underpayment to which section 6662 applies. Section 6662 applies to the portion of any underpayment which is attributable to, inter alia, negligence or disregard of rules or regulations. Sec. 6662(b)(1).

The term "negligence" in section 6662(b)(1) includes any failure to make a reasonable attempt to comply with the Code. Sec. 6662(c). Negligence has also been defined as a failure to do what a reasonable person would do under the circumstances. Leuhsler v. Commissioner, 963 F.2d 907, 910 (6th Cir. 1992), aff'g T.C. Memo. 1991-179; Antonides v. Commissioner, 91 T.C. 686, 699 (1988), aff'd, 893 F.2d 656 (4th Cir. 1990). The term "negligence" also includes any failure by the taxpayer to keep adequate books and records or to substantiate items properly. Sec. 1.6662-3(b)(1), Income Tax Regs. The term "disregard" includes any careless, reckless, or intentional disregard. Sec. 6662(c).

The accuracy-related penalty under section 6662(a) does not apply to any portion of an underpayment if it is shown that there was reasonable cause for, and

[*154] that the taxpayer acted in good faith with respect to, such portion. Sec. 6664(c)(1). The determination of whether the taxpayer acted with reasonable cause and in good faith depends on all the pertinent facts and circumstances, including the taxpayer's efforts to assess the taxpayer's proper tax liability, the knowledge and experience of the taxpayer, and the reliance on the advice of a professional, such as an accountant. Sec. 1.6664-4(b)(1), Income Tax Regs. Reliance on the advice of a professional may demonstrate reasonable cause and good faith if, under all circumstances, such reliance was reasonable and the taxpayer acted in good faith. Id.

Respondent argues that the accuracy-related penalty under section 6662(a) should apply to the portion of the underpayment of gift tax for Mr. Beyer's taxable year 2005 that is attributable to the $55,000 which Mr. Beyer contributed in 2005 to each of eight 2004 section 529 accounts because that portion of the underpayment is due to negligence. We have found that Mr. Beyer did not make a section 529(c)(2)(B) election for, inter alia, his taxable year 2005 and that consequently he made taxable gifts during that year when he made those contributions to those section 529 accounts. We have also found that Mr. Beyer did not report those taxable gifts in his gift tax return for his taxable year 2005 and did not pay gift tax with respect to them for that year.

**[*155]**     Section 529(c)(2)(B) provides that only if the donor makes an election will the aggregate amount of contributions that the donor makes to a section 529 account on behalf of a single beneficiary during a calendar year that exceeds the maximum annual exclusion amount be treated as if the contributions had been made ratably over a five-year period.  The record does not establish that Mr. Beyer, or Craig Plassmeyer on his behalf, asked a qualified tax professional whether or how the election to which section 529(c)(2)(B) refers must be made. We find that that failure to do so constitutes negligence by Mr. Beyer.  See Leuhsler v. Commissioner, 963 F.2d 907 at 910; Antonides v. Commissioner, 91 T.C. 686 at 699.  On the record before us, we find that respondent has satisfied respondent's burden of production under section 7491(c) with respect to the accuracy-related penalty under section 6662(a) on the portion of the underpayment of gift tax for Mr. Beyer's taxable year 2005 that is attributable to the $55,000 which Mr. Beyer contributed to each of eight 2004 section 529 accounts.

Decedent's estate argues under section 6664(c)(1) and the regulations thereunder that Mr. Beyer had reasonable cause for, and acted in good faith with respect to, the portion of the underpayment of gift tax for his taxable year 2005 that is attributable to the $55,000 which Mr. Beyer contributed in 2005 to each of eight 2004 section 529 accounts.  In support of that argument, decedent's estate

**[*156]** contends that "Mr. Beyer and Craig [Plassmeyer] reasonably relied on [Mr.] Madonia's advice, as well as the advice previously conveyed by [Mr.] Holup, an experienced financial advisor at Chase Bank, in determining that the gifts made in 2005 were not required to be reported on a gift tax return." Those contentions are not supported by the record. The record does not establish that Mr. Beyer, or Craig Plassmeyer on his behalf, considered obtaining, let alone sought, qualified professional advice regarding whether or how Mr. Beyer was required to make the section 529(c)(2)(B) election with respect to the $55,000 that Mr. Beyer contributed in 2005 to each of eight 2004 section 529 accounts.

On the record before us, we find that decedent's estate has failed to carry its burden of establishing that there was reasonable cause for, and that Mr. Beyer acted in good faith with respect to, the portion of the underpayment of gift tax for Mr. Beyer's taxable year 2005 that is attributable to the $55,000 which Mr. Beyer contributed in 2005 to each of eight 2004 section 529 accounts.

Based upon our examination of the entire record before us, we find that decedent's estate has failed to carry its burden of establishing that Mr. Beyer, and thus decedent's estate, is not liable for the accuracy-related penalty under section 6662(a) on the portion of the underpayment of gift tax for Mr. Beyer's taxable year 2005 that respondent determined in the notice and that is attributable to the

**[*157]** $55,000 which Mr. Beyer contributed in that year to each of eight 2004 section 529 accounts.

We have considered all of the contentions and arguments of decedent's estate and respondent that are not discussed herein, and we find them to be without merit, irrelevant, and/or moot.

To reflect the foregoing and the concessions of the parties,

<u>Decision will be entered</u>

<u>under Rule 155</u>.